ANDERSON, Circuit Judge:
In the instant ease, plaintiffs-appellees brought a class action under 42 U.S.C. § 1983, alleging that Alabama’s Medicaid plan was not in compliance with a federal regulation requiring State Medicaid plans to ensure necessary transportation for recipients to and from providers. The district court granted summary judgment to the *996 plaintiffs and later approved a remedial plan agreed to by the parties. On appeal, the State officials (hereinafter referred to as “the State”) argue that the regulation does not create a right enforceable in a § 1983 action. For the reasons below, we accept the officials’ argument and reverse the judgment of the district court.
I. FACTS AND BACKGROUND
Here, we set out only the facts relevant to the instant appeal. In particular, because the State does not challenge the district court’s conclusion that the plan was not in compliance with the regulation, we do not detail the facts underlying the lower court’s finding of noncompliance.[1]
We begin by revisiting our previous description of the Medicaid program. In Silver v. Baggiano, 804 F.2d 1211 (11th Cir.1986), we wrote:
Medicaid is a cooperative venture of the state and federal governments. A state which chooses to participate in Medicaid submits a state plan for the funding of medical services for the needy which is approved by the federal government. The federal government then subsidizes a certain portion of the financial obligations which the state has agreed to bear. A state participating in Medicaid must comply with the applicable statute, Title XIX of the Social Security Act of 1965, as amended, 42 U.S.C. § 1396, et seq., and the applicable regulations.
Id. at 1215.
On November 2, 1994, the plaintiffs filed suit under 42 U.S.C. § 1983, arguing that the State’s Medicaid plan failed to ensure non-emergency transportation as required by federal law. Specifically, the plaintiffs relied on a regulation which provides:
A State plan must—
(a) Specify that the Medicaid agency will ensure necessary transportation for recipients to and from providers; and
(b) Describe the methods that the agency will use to meet this requirement.
42 C.F.R. § 431.53. The defendants moved for dismissal or, alternatively, for a stay pending “administrative and legislative review and action.” In a memorandum order denying the motion, the district court described the arguments raised by the defendants’ brief:
The most important of these [arguments] is Defendants’ contention that no specific non-emergency transportation benefits are mandated by federal statute. They argue that the statute itself does not require transportation, so that the regulation referring to transportation goes beyond the congressional mandate. Therefore, Defendants contend, the regulation does not create a right which is enforceable under § 1983. They argue further that although the Medicaid regulations that implement the statute recognize the need for transportation, those regulations fail to spell out any specific parameters or requirements regarding transportation. Defendants contend that the issue has been left nonspecific so that each state may best deal with this issue as it sees fit. Consequently, Defendants argue that Plaintiffs have not asserted a valid cause of action under 42 U.S.C. § 1983.
883 F.Supp. 1511, 1513 (M.D.Ala.1995). In a thorough opinion, the district court reviewed the relevant case law and rejected the defendants’ arguments. Id. at 1514-22. After the district court granted summary judgment in favor of the plaintiffs, 896 F.Supp. 1120 (M.D.Ala.1995), the defendants filed the instant appeal.
II. ISSUE
The narrow issue presented for decision today is whether Medicaid recipients have a federal right to transportation which may be enforced in an action under § 1983.[2]
*997 III. DISCUSSION
We begin by reviewing the Supreme Court’s case law governing whether and under what circumstances violations of federal statutes create a cause of action under 42 U.S.C. § 1983.[3] Then, we apply that case law to the case before us today.
A. The Supreme Court’s Case Law
In 1980, the Supreme Court rejected the argument that § 1983 creates a cause of action only for constitutional violations and for the violation of civil rights and equal protection laws; the Court held that the statute encompasses claims based on “purely statutory” violations of federal law. Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). By 1987, the Supreme Court had recognized two limitations to the broad proposition that § 1983 is available to enforce violations of federal statutes by agents of the state. See Wright v. Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423,107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987) (citing decisions subsequent to Thiboutot). First, plaintiffs cannot sue under § 1983 for violations of a federal statute where “Congress has foreclosed such enforcement of the statute in the enactment itself.” Id. Second, because § 1983 speaks in terms of “rights, privileges, or immunities,” not merely violations of federal law, only “federal rights” are enforceable under § 1983. Id. Because our resolution of the instant case turns on the second of the two limitations — i.e., the “federal rights” issue, we do not detail the portions of the Supreme Court decisions dealing with the first limitation.[4]
In Wright, the plaintiffs claimed that the defendant housing authority had overbilled them for utilities and had thus violated a federal statute imposing a rent ceiling and the statute’s implementing regulations, which required public housing authorities to include a reasonable utility allowance in tenants’ rent. In answer to the defendant’s claim that neither the statute nor the regulations gave the tenants an enforceable right within the meaning of § 1983, the Court wrote succinctly:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any Stale or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.
We perceive little substance in this claim. The Brooke Amendment could not be clearer: as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of their income. This was a mandatory limitation focusing on the individual family and its income. The intent to benefit tenants is undeniable. Nor is there any question that HUD interim regulations, in effect when this suit began, expressly required that a “reasonable” amount for utilities be included in rent that a PHA was allowed to charge, an interpretation to which HUD has adhered both before and after the adoption of the Brooke Amendment. HUD’s view is entitled to deference as a valid interpretation of the statute, and Congress in the course of amending that provision has not disagreed with it.
Respondent nevertheless asserts that the provision for a “reasonable” allowance for utilities is too vague and amorphous to confer on tenants an enforceable “right” within the meaning of § 1983 and that the whole matter of utility allowances must be left to the discretion of the PHA, subject to supervision by HUD. The regulations, however, defining the statutory concept of “rent” as including utilities, have the force of law ..., they specifically set out guidelines that the PHAs were to follow in *998 establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances. In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under Pennhurst [Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ] and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.
Id. at 430-32, 107 S.Ct. at 773-75 (footnotes omitted).[5]
In Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989), the Court considered whether the petitioner, a cab company involved in a .labor dispute, could sue under § 1983 to vindicate violations of the rule of law announced in Lodge 76, International Ass’n of Machinists and Aerospace Workers v. Wisconsin Employment Relations Com’n, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). In Machinists, the Court had “reiterated that Congress intended to give parties to a collective-bargaining agreement the right to make use of ‘economic weapons,’ not explicitly set forth in the Act, free of government interference.” Golden State Transit, 493 U.S. at 110-11, 110 S.Ct. at 451. In Golden State Transit, petitioners brought suit under § 1983 seeking monetary damages for city interference which the Court, in an earlier case, had held violated federal law under Machinists. Having noted that there was no “substantial question” that the holding in the previous case was “within the competence of the judiciary to enforce,” the Supreme Court concluded that the petitioner was “the intended beneficiary of a statutory scheme that prevents governmental interference with the collective-bargaining process and that the NLRA gives [petitioner] rights enforceable against governmental interference in an action under § 1983.” Id. at 109, 110 S.Ct. at 450. As for the argument of the courts below that no § 1983 cause of action could he because government interference with the use of “economic weapons” did not constitute a “direct violation” of the statute, the Court wrote:
We have held, based on the language, structure, and history of the NLRA, that the Act protects certain rights of labor and management against governmental interference. While it is true that the rule of the Machinists case is not set forth in the specific text of an enumerated section of the NLRA, that might well also be said with respect to any number of rights or obligations that we have found implicit in a statute’s language. A rule of law that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory provision is no less binding than a rule that is based on the plain meaning of a statute. The violation of a federal right that has been found to be implicit in a statute’s language and structure is as much a “direct violation” of a right as is the violation of a right that is clearly set forth in the text of the statute.
Id. at 111-12, 110 S.Ct. at 451. According to the Court, “the interest in being free of governmental regulation of the ‘peaceful methods of putting economic pressure upon one another,’ ... is a right specifically conferred on employers and employees by the NLRA.” Id. at 112, 110 S.Ct. at 452 (quoting Machinists, 427 U.S. at 154, 96 S.Ct. at 2560).[6]
*999 In Wilder v. Virginia Hosp. Ass’n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Court summarized the test that previous decisions had developed for determining whether the statute in question creates a “federal right” enforceable under § 1983. According to the Court:
Such an inquiry turns on whether the provision in question was intend[ed] to benefit the putative plaintiff____ If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, ... or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.
Id. at 509, 110 S.Ct. at 2517 (citations and internal quotations omitted). The Court applied this test (“the three-prong test”[7]) to the following facts. Plaintiff health care providers brought a § 1983 suit to enforce an amendment to the Medicaid Act requiring State plans to
provide ... for payment ... of [services] ... through the use of rates (determined in accordance with methods and standards developed by the State ... ) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities....
Id. at 502-03, 110 S.Ct. at 2514 (quoting 42 U.S.C. § 1396a(a)(13)(A)). According to the plaintiffs, the reimbursement formula used by the Commonwealth of Virginia did not generate rates that were “reasonable and adequate” as defined by the statute. The defendants argued that plaintiffs did not have an enforceable federal right to reasonable and adequate reimbursement. Applying its three-prong test, the Court determined that the amendment did indeed create an enforceable right to reasonable and adequate rates.
As to the first prong, the Court concluded that the amendment was intended to benefit the plaintiff class. In support of its conclusion, the Court relied on the fact that “[t]he provision establishes a system for reimbursement of providers and is phrased in terms benefitting health care providers....” Id. at 510, 110 S.Ct. at 2517-18.
Turning to the question whether the amendment imposed a “binding obligation” on the States, the Court looked first to the language of the statute and noted:
The Boren Amendment is cast in mandatory rather than precatory terms: The state plan “must” “provide for payment ... of hospitals]” according to rates the State finds are reasonable and adequate.... Moreover, provision of federal funds is expressly conditioned on compliance with the amendment and the Secretary is authorized to withhold funds for noncompliance with this provision.
Id. at 512, 110 S.Ct. at 2519 (emphasis in original). Then, the Court addressed the defendants’ argument that the only binding obligation was an essentially procedural one: the State must provide some reimbursement, must itself find that its rates are reasonable, and must make assurances satisfactory to the Secretary. The Court rejected this interpretation, refusing to make the federal requirement a “dead letter”: “It would make little sense for Congress to require a State to .make findings without requiring those findings to be correct. In addition, there would be no reason to require a State to submit assurances to the Secretary if the statute did not require the State’s findings to be reviewable in some manner by the Secretary.” Id. at 514, 110 S.Ct. at 2520. The Court found further support for its conclusion that the Amendment created enforceable rights in the fact that the Secretary was entitled to reject a plan upon concluding that the State’s assurances of compliance were unsatisfactory: “If the Secretary is entitled to reject a state plan upon concluding that a State’s assurances of compliance are unsatisfactory, ... a *1000 State is on notice that it cannot adopt any rates it chooses and that the requirement that it make ‘findings’ is not a mere formality.” Id. Finally, the Court reviewed the legislative history of the Amendment and determined that it showed that “the requirements of ‘findings’ and ‘assurances’ prescribe the respective roles of a State and the Secretary and do not, as petitioners suggest, eliminate a State’s obligation to adopt reasonable rates.” Id. at 519, 515-19, 110 S.Ct. at 2522, 2520-22.
Finally, the Court looked to the question whether the obligation was “too vague and ambiguous” to be judicially enforceable. The Court concluded that it was not, noting both that the statute and accompanying regulations set out factors which a State was to consider in adopting its rates and that the statute provided the objective benchmark of an “efficiently and economically operated facility.” Id. at 519, 110 S.Ct. at 2522-23. The Court wrote:
While there may be a range of reasonable rates, there certainly are some rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a State’s findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.
Id. at 519-20, 110 S.Ct. at 2523.[8]
In 1992, the Court decided Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). At issue in Suter was a provision of the Adoption Assistance and Child Welfare Act that required participating States to submit a plan[9] which “provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home.” Id. at 351, 112 S.Ct. at 1364 (quoting 42 U.S.C. § 671(a)(15)). The Court began its discussion of the § 1983 inquiry by reviewing its earlier decisions, noting that the opinions in those cases “took pains to analyze the statutory provisions in detail, in light of the entire legislative enactment.” Id. at 357, 112 S.Ct. at 1367. The Court also revisited an earlier statement regarding the special concerns present in § 1983 suits brought to enforce the requirements of Congressional acts passed pursuant to the Spending Clause:
The legitimacy of Congress’ power to legislate under the spending power ... rests on whether the State voluntarily and knowingly accepts the terms of the “contract.” There can, of course, be no knowing acceptance if a State is unaware of the conditions or' is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.
Id. at 356, 112 S.Ct. at 1366 (quoting Pennhurst State Sch. and Hosp. v. Halderman, *1001 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981)[10]).
The question in the ease before it, said the Court, was “Did Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make ‘reasonable efforts’ to prevent a child from being removed from his home, and once removed to reunify the child with his family?” Id. at 357, 112 S.Ct. at 1367. Turning to an examination of “exactly what is required of States by the Act,” the Court wrote:
Here, the terms of § 671(a) are clear: “In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary.” Therefore the Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features.
Id. at 358, 112 S.Ct. at 1367. In a footnote following this language, the Court noted:
Contrary to respondents’ assertion that finding [the statute] to require only the filing of a plan for approval by the Secretary would add a new “prerequisite for the existence of a right under § 1983,” ... our holding today imposes no new “prerequisites” but merely counsels that each statute must be interpreted by its own terms.
Id. at 358 n. 8, 112 S.Ct. at 1367 n. 8. The Court then distinguished the case before it from its previous decision in Wilder. In Wilder, the Court wrote, the statute and regulations had set forth “in some detail” the factors to be considered in determining £he methods for calculating reimbursement rates; in the case before the Court, however, no further statutory guidance was given as to how to measure “reasonable efforts” to maintain an abused or neglected child in his or her home, or return the child to his or her home from foster care. Id. at 359-60, 112 S.Ct. at 1368. To find no federal right to “reasonable efforts” did not, according to the Court, render the provision a “dead letter” because the Secretary retained authority to reduce or eliminate payments upon a finding of noncompliance and because federal reimbursement for foster care payments made with respect to an involuntary removal from the home had to be the result of a judicial determination that continuing in the home would be contrary to the welfare of the child. Id. at 360-61, 112 S.Ct. at 1368-69. Finally, the Court examined the regulations promulgated to enforce the Adoption Act:
The regulations promulgated by the Secretary to enforce the Adoption Act do not evidence a view that § 671(a) places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary. The regulations provide that to meet the requirements of § 671(a)(15) the case plan for each child must “include a description of the services offered and the services provided to prevent removal of the child from the home and to reunify the family.” 45 CFR § 1356.21(d)(4) (1991). Another regulation, entitled “requirements and submittal,” provides that a state plan must specify “which preplacement preventive and reunification services are available to children and families in need.” § 1357.15(e)(1). What is significant is that the regulations are not specific and do not provide notice to the States that failure to do anything other than submit a plan with the requisite features, to be approved by the Secretary, is a further condition on the receipt of funds from the Federal Government.
Id. at 361-62, 112 S.Ct. at 1369 (footnotes omitted).[11]
*1002 In the wake of Suter, federal courts of appeals took somewhat divergent views of what general propositions should be derived from the Court’s decision and, in particular, from the Court’s distinguishing of the decision in Wilder. According to the First Circuit, the key element of Suter was an instruction that “when a provision in a statute fails to impose a direct obligation on the States, instead placing the onus of [ensuring] compliance with the statute’s substantive provisions on the federal government, no cause of action cognizable under section 1983 can flourish.” Stowell v. Ives, 976 F.2d 65, 70 (1st Cir.1992). In the Second Circuit’s view, “[T]he significant point in Suter was not that the statute in question only required a state to submit a plan to the federal agency but that the statute provided no guidance for measuring ‘reasonable efforts.’ ” Marshall v. Switzer, 10 F.3d 925, 929 (2d Cir.1993). The Eighth Circuit concluded that Suter added “additional considerations” to the approach applied in Wilder. Arkansas Medical Soc., Inc. v. Reynolds, 6 F.3d 519, 525 (8th Cir.1993) (noting the Suter Court’s emphasis on the fact that rights must be “unambiguously” conferred and that each statute must be examined on its own basis).[12]
Our obligation to discern the law in this area does not end with interpreting Suter. In 1994, Congress enacted the following amendment to the Social Security Act:
§ 1320a-2 Effect of failure to carry out State plan
In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action.
42 U.S.C. § 1320a-2. There has been some suggestion that this statute “overrules” Suter entirely and that we should determine the “federal rights” question only according to the pre-Suter precedents. See Jeanine B. by Blondis v. Thompson, 877 F.Supp. 1268, 1283 (E.D.Wis.1995) (“[T]he court must ‘rewind the clock’ and look to cases prior to Suter to determine the enforceability of other provisions under the Adoption Assistance Act [beyond the specific one involved in Suter].”). We reject this argument on the basis of the plain language of the statute. Section 1320a-2 does not purport to reject any and all grounds relied upon in Suter; it purports only to overrule certain grounds' — i.e., that a provision is unenforceable simply because of *1003 its inclusion in a section requiring a state plan or specifying the contents of such a plan.
As is suggested by the above survey of the case law in other circuits, it may well be that the grounds Congress “overruled” were never relied upon by the Suter Court. In other words, it may well be that the majority never intended to suggest that substantive provisions included in legislation requiring a State plan or specifying the contents of that State plan are a fortiori unenforceable under § 1983.[13] In particular, we note that any such rule is plainly inconsistent with Wilder, which the Court did not overrule, but expressly distinguished. See LaShawn A. v. Barry, 69 F.3d 556, 569, 568-70 (D.C.Cir.1995) (concluding that § 1320a-2 is essentially meaningless because the Suter Court “did not find provisions of the Adoption Assistance Act unenforceable ‘because of ... inclusion in a section of [the Act] requiring a State plan or specifying the required contents of a State plan’”), superseded by decision en banc, 87 F.3d 1389 (D.C.Cir.1996) (not addressing the Suter issue), cert. denied, — U.S. -, 117 S.Ct. 2431, 138 L.Ed.2d 193 (1997). However, we need not definitively resolve the question whether Suter announced or implicitly stood for the rule rejected by Congress: in light of the statute, it is clear that the mere fact that an obligation is couched in a requirement that the State file a plan is not itself sufficient grounds for finding the obligation unenforceable under § 1983.
Finally, we turn to Blessing v. Freestone, — U.S. -, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the most recent Supreme Court case in this area. In Blessing, parents of children entitled to receive child support services from the State pursuant to Title IV-D of the Social Security Act sued the director of the State child support agency under § 1983, claiming they had an enforceable right to have the State program achieve “substantial compliance” with the requirements of Title IV-D.[14] A unanimous Supreme Court reversed the Ninth Circuit’s decision in favor of the plaintiffs. After summarizing the three-factor test used to determine whether a particular statutory provision gives rise to a federal right, the Court turned to the case before it. The Court began by rejecting the Ninth Circuit’s general approach:
Without distinguishing among the numerous rights that might have been created by this federally funded welfare program, the Court of Appeals agreed in sweeping terms that “Title IV-D creates enforceable rights in families in need of Title IV-D services.” ...
[T]he lower court’s holding that Title IV-D “creates enforceable rights” paints with too broad a brush. It was incumbent upon respondents to identify with particularity the rights they claimed, since it is impossible to determine whether Title IV-D, as an undifferentiated whole, gives rise to undefined “rights.”
Id. at -, 117 S.Ct. at 1360. As for the particular statutory provision requiring States to operate their child support programs in substantial compliance with Title IV-D,[15] the Court concluded that this provision “was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right.” Id. at -, 117 S.Ct. at 1361. The Court explained:
Far from creating an individual entitlement to services, the standard is simply a yardstick for the Secretary to measure the systemwide performance of a State’s Title *1004 IV-D program. Thus, the Secretary must look to the aggregate services provided by the State, not to whether the needs of any particular person have been satisfied. A State substantially complies with Title IVD when it provides most mandated services ... in only 75 percent of the cases reviewed during the federal audit period.... States must aim to establish paternity in 90 percent of all eligible cases, but may satisfy considerably lower targets so long as their efforts are steadily improving.... It is clear, then, that even when a State is in “substantial compliance” with Title IV-D, any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet. Moreover, even upon a finding of substantial noncompliance, the Secretary can merely reduce the State’s AFDC grant by up to five percent; she cannot, by force of her own authority, command the State to take any particular action or to provide any services to certain individuals. In 'short, the substantial compliance standard is designed simply to trigger penalty provisions that increase the frequency of audits and reduce the State’s AFDC grant by a maximum of five percent. As such, it does not give rise to individual rights.
Id. (emphasis in original). As for the Ninth Circuit’s “blanket approach” in determining that Title IV-D creates enforceable rights, the Court concluded that “[i]t is readily apparent that many other provisions [besides the ‘substantial compliance’ provision] ... do not fit our traditional three criteria for iden-. tifying statutory rights.” Id. The Court wrote:
To begin with, many provisions, like the “substantial compliance” standard, are designed only to guide the State in structuring its systemwide efforts at enforcing support obligations. These provisions may ultimately benefit individuals who are eligible for Title IV-D services, but only indirectly. For example, Title IV-D lays out detailed requirements for the State’s data processing system.... Obviously, these complex standards do not give rise to individualized rights to computer services. They are simply intended to improve the overall efficiency of the States’ child support enforcement scheme.
The same reasoning applies to the staffing levels of the state agency, which respondents seem to claim are inadequate .... Title IV-D generally requires each participating State to establish a separate child support enforcement unit “which meets such staffing and organizational requirements as the Secretary may by regulation prescribe.” ... The regulations, in turn, simply provide that each level of the State’s organization must have “sufficient staff’ to fulfill specified functions. These mandates do not, however, give rise to federal rights. For one thing, the link between increased staffing and the services provided to any particular individual is far too tenuous to support the notion that Congress meant to give each and every Arizonan who is eligible for Title IV-D the right to have the State Department of Economic Security staffed at a “sufficient” level. Furthermore, neither the statute nor the regulation gives any guidance as to how large a staff would be “sufficient.” ... Enforcement of such an undefined standard would certainly “strain judicial competence.”
Id. at -, 117 S.Ct. at 1361-62. Leaving open the possibility that some provisions of Title IV-D give rise to enforceable individual rights, the Court sent the case back to the district court to determine “exactly what rights, considered in their most concrete, specific form” respondents were asserting as well as whether any of the specific claims asserted an individual federal right. Id. at -, 117 S.Ct. at 1362.
Although we are reluctant to state many general propositions of law in this area, we think it safe to summarize a few principles derived from the above discussion. First, the holdings of Wright, Wilder, and Suter all remain good law. Second, the three-prong “enforceable rights” test developed in Wright and Wilder remains good law. Finally, the Supreme Court’s admonitions in Suter which fall short of proposing that State-plan statutes are a fortiori unenforceable under § 1983 remain good law. With these principles in mind, we proceed to determine wheth *1005 er plaintiffs have an enforceable right to transportation under the Medicaid statute and the accompanying regulations.
B. Do Medicaid Recipients Have a “Federal Right” to Transportation?
In the instant ease, the plaintiffs seek to enforce a transportation requirement that appears explicitly not in the Medicaid Act, but in a federal regulation. The plaintiffs argue that the transportation regulation is a valid interpretation of at least one of several statutory provisions found at 42 U.S.C. § 1396a(a). Those provisions are as follows:
(a) A State plan for medical assistance must—
(1) provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them;
(4) provide (A) such methods of administration ... as are found by the Secretary to be necessary for the proper and efficient operation of the plan
(8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals;
(10) (B) that the medical assistance made available to any individual described in subparagraph (A) [describing the so-called “categorically needy”]
(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A) ...;
(19) provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients;
(23) provide that (A) any individual eligible for medical assistance ... may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services....
According to the plaintiffs, the regulatory and statutory provisions create a federal right to transportation to and from providers.[16]
We turn initially to questions regarding the appropriate analytical approach for cases such as the instant one which involve federal regulations. As a previous panel of this court has pointed out, “There is no precedent in our circuit and those that exist are split and far from clear.” Colvin v. Housing Auth. of Sarasota, Fla., 71 F.3d 864, 865 n. 1 (11th Cir.1996) (concluding that the issue had been waived in the case before it). The plaintiffs point out that the Sixth Circuit has asserted that because federal regulations *1006 have the force of law, they may create enforceable rights under § 1983. Loschiavo v. City of Dearborn, 33 F.3d 548, 551 (6th Cir.1994), cert. denied, 513 U.S. 1150, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995). Accordingly, the Loschiavo panel simply applied the three prongs of the “federal right” test directly to the regulation at issue — i.e., the panel asked whether the regulation was intended to benefit the plaintiff, whether the regulation imposed a mandatory obligation, and whether the regulation was capable of judicial enforcement. Id. at 552-53. See also Levin v. Childers, 101 F.3d 44, 47 (6th Cir.1996) (describing Loschiavo as holding “that ‘plaintiffs may use Section 1983 to enforce not only constitutional rights, but also those rights defined by federal statutes [and federal regulations]’ ”) (brackets in original).[17] Similarly, we note that three Justices of the Supreme Court have expressed the view that a valid regulation can create a federal right enforceable under § 1983. In Guardians Ass’n v. Civil Serv. Comm’n of New York, 463 U.S. 582, 638, 103 S.Ct. 3221, 3251, 77 L.Ed.2d 866 (1983), Justice Stevens, joined by Justices Brennan and Blackmun, wrote: “[I]t is clear that the § 1983 remedy is intended to redress the deprivation of rights secured by all valid federal laws, including statutes and regulations having the force of law.” According to these Justices, the rationale of Maine v. Thiboutot, whose holding applied expressly only to federal statutes, applies equally to administrative regulations having the force of law. Id. at 638 n. 6, 103 S.Ct. at 3251 n. 6.
On the other hand, we note that four Justices have suggested that “federal rights” enforceable under § 1983 cannot derive either from valid regulations alone or from any and all valid administrative interpretations of statutes creating federal rights. In Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), Justice O’Connor, joined by Chief Justice Rehnquist, Justice Powell, and Justice Scalia, wrote in dissent:
In the absence of any indication in the language, legislative history, or administrative interpretation of the Brooke Amendment that Congress intended to create an enforceable right to utilities, it is necessary to ask whether administrative regulations alone could create such a right. This is a troubling issue not briefed by the parties, and I do not attempt to resolve it here. The Court’s questionable reasoning that, because for four years HUD gave somewhat less discretion to the PHA’s in setting reasonable utilities allowances, HUD understood Congress to have required enforceable utility standards, apparently allows it to sidestep the question. I am concerned, however, that lurking behind the Court’s analysis may be the view that, once it has been found that a statute creates some enforceable right, any regulation adopted within the purview of the statute creates rights enforceable in federal courts, regardless of whether Congress or the promulgating agency ever contemplated such a result. Thus, HUD’s frequently changing views on how best to administer the provision of utilities to public housing tenants becomes the focal point for the creation and extinguishment of federal “rights.” Such a result, where determination of § 1983 “rights” has been unleashed from any con *1007 neetion to congressional intent, is troubling indeed.
Id. at 437-38, 107 S.Ct. at 777-78. The Fourth Circuit, citing the position of the dissent in Wright, has written that “[a]n administrative regulation ... cannot create an enforceable § 1983 interest not already implicit in the enforcing statute.” Smith v. Kirk, 821 F.2d 980, 984 (4th Cir.1987). See also Former Special Project Employees Ass’n v. City of Norfolk, 909 F.2d 89 (4th Cir.1990) (following Smith v. Kirk ).[18]
Given the fact that the view set out above represented the position of the dissenting Justices in Wright, we think our first obligation is to ascertain whether the majority opinion in Wright, which remains binding upon us, rejected the dissent’s position regarding eases involving federal regulations. Ultimately, we are persuaded that the majority did not reject that position and thus that the majority’s opinion does not foreclose arguments that turn on the concerns expressed by the dissent. Because careful attention to the language of the majority’s opinion is required, we set out the relevant discussion again:
The Brooke Amendment could not be clearer: as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of their income. This was a mandatory limitation focusing on the individual family and its income. The intent to benefit tenants is undeniable. Nor is there any question that HUD interim regulations, in effect when this suit began, expressly required that a “reasonable” amount for utilities be included in rent that a PHA was allowed to charge, an interpretation to which HUD has adhered both before and after the adoption of the Brooke Amendment. HUD’s view is entitled to deference as a valid interpretation of the statute, and Congress in the course of amending that provision has not disagreed with it.
Respondent nevertheless asserts that the provision for a “reasonable” allowance for utilities is too vague and amorphous to confer on tenants an enforceable “right” within the meaning of § 1983 and that the whole matter of utility allowances must be left to the discretion of the PHA, subject to supervision by HUD. The regulations, however, defining the statutory concept of “rent” as including utilities, have the force of law ..., they specifically set out guidelines that the PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances. In our view, the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under Pennhurst [Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ] and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.
Wright, 479 U.S. at 430-32, 107 S.Ct. at 773-75. We do not think the passage is fairly read to hold that federal rights are created either by regulations of their own force or by any valid administrative interpretation of a statute that creates some enforceable right. We begin by noting that the majority nowhere takes issue with the dissent’s suggestion that the majority did not hold so much. As for what the majority did say, we note the persistent focus on tying the right to a reasonable utility allowance to Congressional intent to create federal rights. We find significant in this regard the fact that the majority first focused directly on the statutory provision creating the rent ceiling, describing the provision as “a mandatory limitation focusing on the individual family and its income.” In other words, the Court seemed to locate the *1008 right in the statutory provision, turning to the regulation only to answer the respondent’s argument that HUD’s definition of the statutory concept of “rent” was not authorized by the statute. See id. at 430 n. 11, 107 S.Ct. at 774 n. 11 (“We thus reject respondent’s argument that the Brooke Amendment’s rent ceiling applies only to the charge for shelter and that the HUD definition of rent as including a reasonable charge for utilities is not authorized by the statute.”). Although the Court in that discussion spoke of the deference owed to valid administrative interpretations of statutes, it did so in the particular context of a regulation that merely defined the content of a specific right that, in the majority’s opinion, Congress had conferred upon the plaintiffs by statute. See id. at 431, 107 S.Ct. at 774 (referring to the regulations as “defining the statutory concept of ‘rent’ ”). In conclusion, the Court reiterated that it believed that “the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under Pennhurst and § 1983, rights that are not, as respondent suggests, beyond the competence of the judiciary to enforce.” Id. at 432, 107 S.Ct. at 774-75 (emphasis added).[19] We conclude that the Wright majority did not hold that federal rights are created either by regulations “alone” or by any valid administrative interpretation of a statute creating some enforceable right.
In our view, the driving force behind the Supreme Court’s case law in this area is a requirement that courts find a Congressional intent to create a particular federal right. We find a clear expression of this in Suter, where the Court posed as the dispositive question: “Did Congress, in enacting the Adoption Act, unambiguously confer upon the child beneficiaries of the Act a right to enforce the requirement that the State make ‘reasonable efforts’ to prevent a child from being removed from his home, and once removed to reunify the child with his family?” 503 U.S. at 357,112 S.Ct. at 1367. In light of this focus, we reject the Sixth Circuit’s approach — i.e., finding a “federal right” in any regulation that in its own right meets the three-prong “federal rights” test. For the same reason, we also reject the approach labeled “troubling” by the dissent in Wright — i.e., finding enforceable rights in any valid administrative interpretation of a statute that creates some enforceable right.
We need not in this case define the precise role which a valid regulation may play in the “federal rights” analysis.[20] Wright would *1009 seem to indicate that so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute — “in conjunction with the regulation” — may create a federal right as further defined by the regulation.[21] In Wright, the statute itself conferred a specific right on the plaintiffs: tenants could be charged as rent no more and no less than 30% of their income. The regulation concerning the utility allowance merely defined the statutory concept of “rent.” Thus, Wright has been described as holding that “[a] statute providing that tenants in low-income housing could only be charged 30% of their income in rent, in conjunction with regulations providing that ‘reasonable utilities’ costs were included in the rental figure, created [a] right under § 1983 to not be charged more than a ‘reasonable’ amount for utilities.” Suter, 503 U.S. at 361 n. 13, 112 S.Ct. at 1369 n. 13.
On the other hand, if the regulation defines the content of a statutory provision that creates no federal right under the three-prong test, or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, we think the regulation is too far removed from Congressional intent to constitute a “federal right” enforceable under § 1983.[22] To hold otherwise would be inconsistent with the driving force of the Supreme Court precedent requiring a Congressional intent to create federal rights and with the Supreme Court’s directive that courts must find that Congress has unambiguously conferred federal rights on the plaintiff. See Suter, 503 U.S. at 357, 112 S.Ct. at 1367; see also Pennhurst, 451 U.S. at 18, 24-25, 101 S.Ct. at 1540, 1543-44.
Applying these principles to the case at hand, we conclude that the transportation *1010 regulation does not define the content of any specific right conferred upon the plaintiffs by Congress. In our view, the nexus between the regulation and Congressional intent to create federal rights is simply too tenuous to create an enforceable right to transportation.[23]
We turn first to the “methods of administration” provision primarily relied upon by the plaintiffs and by the court below. We conclude that the plaintiffs do not have an enforceable right to “methods of administration.” Just last term, in Blessing v. Freestone, — U.S. -, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), the Court distinguished between provisions of Title IV-D intended to benefit individual recipients and provisions intended “only to guide the State in structuring its systemwide efforts at enforcing support obligations.” Id. at -, 117 S.Ct. at 1361. We conclude that the “methods of administration” statute is intended only to guide the State in structuring its efforts to provide care and services to Medicaid recipients and, therefore, that it does not create a federal right enforceable by the plaintiffs. Because we conclude that Congress did not intend to confer upon the plaintiffs a federal right to “methods of administration,” it follows that a regulation defining the precise content of that statutory requirement cannot create a federal right.
We reach a similar conclusion regarding § 1396a(a)(19), which requires that State plans provide “such safeguards as may be necessary to assure that ... care and services will be provided ... in a manner consistent with simplicity of administration and the best interests of the recipients.” We conclude that this section imposes only a generalized duty on the States — in other words, the provision is insufficiently specific to confer any particular right upon the plaintiffs. See Suber, 503 U.S. at 363, 112 S.Ct. at 1370 (“[T]he ‘reasonable efforts’ language does not unambiguously confer an enforceable right upon the Act’s beneficiaries. The term ‘reasonable efforts’ in this context is at least as plausibly read to impose only a rather generalized duty on the States.”). Other courts have reached similar conclusions with respect to § 1396a(a)(19). See Bumpus v. Clark, 681 F.2d 679, 683 (9th Cir.1982) (“Section 1396a(a)(19) is not the sort of specific condition for receipt of federal funds which can be said to create substantive rights in Medicaid recipients.”), opinion withdrawn as moot, 702 F.2d 826 (9th Cir.1983); Stewart v. Bernstein, 769 F.2d 1088, 1093 (5th Cir.1985) (citing Bumpus with approval); Cook v. Hairston, No. 90-3437, 948 F.2d 1288 (6th Cir. Nov.26, 1991) (unpublished disposition) (“[T]he district court did not err in finding that the [provisions] in question were not sufficiently specific and definite to permit enforcement through § 1983.”).[24] Again, we *1011 do not believe that in the absence of a federal right created by Congress, an implementing regulation can create a right enforceable under § 1983.
Next, we turn to the provisión of § 1396a which requires that a State plan “provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them.” § 1396a(a)(l). The gist of the plaintiffs’ argument with regard to this provision seems to be that providing transportation to and from providers is necessary to ensure that the plan is truly “in effect” in all areas of the State. However, the Supreme Court has rejected a similar argument in the Title IVD context. In Suter, the plaintiffs relied on the analogous provision in Title IV-D[25] to argue that the State had a substantive obligation enforceable in a § 1983 action to make the “reasonable efforts” required elsewhere in the statute; if such efforts were not made, the argument apparently went, the plan would not be “in effect.” The Court rejected this argument: “[W]e think that ‘in effect’ is directed to the requirement that the plan apply to all political subdivisions of the State, and is not intended to otherwise modify the word ‘plan.’ ” Suter, 503 U.S. at 359, 112 S.Ct. at 1368. The Court’s conclusion that the “shall be in effect” provision of the Adoption Assistance Act requires only that the plan apply to all political subdivisions would seem to foreclose arguments (such as the plaintiffs’) that attempt to use “shall be in effect” provisions in other State-plan legislation as a bootstrap for enforcing requirements imposed on such plans by other statutory provisions.
Finally, we find no right under the regulation read in conjunction with any of the remaining statutory sections cited by the plaintiffs: § 1396a(a)(8), which requires that State plans provide that “individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals”; § 1396a(a)(10)(B), which requires that State plans provide that medical assistance provided to any “categorically needy” recipient shall not be less “in amount, duration, or scope” than the assistance made available to other categorically needy recipients or to “medically needy” recipients;[26] or § 1396a(a)(23), which requires that the State plan provide that individuals eligible for medical assistance may obtain such assistance from qualified providers who undertake to provide the service or services required. It may be that each of these statutes creates some federal right;[27] similarly, it may be that the transportation regulation is a valid interpretation of each of these provisions under Chevron. However, we do not think these two factors, even if we found both to be true, would add up to a federal right to transportation. In each case the transportation regulation would be valid not because it reasonably defines the content of rights created by the statutory provisions, as did the regulation in Wright, but only because the regulation furthers the broad objectives underlying each statutory provision. In other *1012 words, we do not think that transportation to and from providers is reasonably understood to be part of the content of a right to prompt provision of assistance, comparable assistance, or choice among providers. Instead, if the regulation is a valid interpretation of these provisions, it would be because transportation may be a reasonable means of ensuring the prompt provision of assistance, comparable assistance, or choice among providers. Such links to Congressional intent may be sufficient to support the validity of a regulation; however, we think they are too tenuous to support a conclusion that Congress has unambiguously conferred upon Medicaid recipients a federal right to transportation enforceable under § 1983.
IV. CONCLUSION
For the foregoing reasons, we conclude that the plaintiffs do not have a federal right, enforceable under § 1983, to transportation to and from Medicaid providers.[28] We therefore reverse the judgment of the district court and remand with instructions to grant the State’s motion to dismiss.
REVERSED AND REMANDED.

. Those facts are set out in the district court’s published opinion. Harris v. James, 896 F.Supp. 1120 (M.D.Ala.1995).

. Plaintiffs argue that the State in its initial brief preserved only the argument that the regulation is not a valid interpretation of the statute. Having reviewed the briefs carefully, we conclude that while it is true that the State chose to argue the point primarily by challenging the validity of the regulation, the initial brief did adequately raise the broad question regarding whether plaintiffs have a "federal right” to transportation *997 enforceable under § 1983. We note also that the “federal right" issue was presented to and ruled upon by the district court, and on appeal, both parties were given an additional opportunity to address the issue in letter briefs requested by the panel.

.42 U.S.C. § 1983 provides in relevant part:

.We note for the interested reader that Wilder v. Virginia Hosp. Ass’n, 496 U.S. 498, 520-23, 110 S.Ct. 2510, 2523-25, 110 L.Ed.2d 455 (1990), rejected an argument that "Congress has foreclosed enforcement of the Medicaid Act under § 1983.”

. In dissent, Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, argued that there was no federal right enforceable under § 1983. The dissenters argued that neither the language of the Brooke Amendment, nor its legislative history, nor its interpretation by HUD supported the conclusion that Congress intended to create an entitlement to reasonable utilities and that, even assuming that regulations alone could create federal rights, the regulations at issue simply were not capable of judicial enforcement because they neither provided a basis for calculating an individual tenant's rent nor provided for a remedy in the event of a violation. Id. at 432-41, 107 S.Ct. at 775-80. As we discuss below, the dissenters also expressed strong reservations regarding the issue that they assumed arguendo — i.e., that regulations alone could create federal rights. Id. at 437-38, 107 S.Ct. at 777-78.

. Justice Kennedy, joined by Chief Justice Rehnquist and Justice O'Connor, dissented, arguing that Machinists pre-emption "rests upon that allocation of power rather than upon individual rights, privileges, or immunities.” Id. at 117-18, 110 S.Ct. at 455.

. Although the Supreme Court has sometimes referred to these "prongs” in a different order, see Blessing v. Freestone, - U.S. -, -, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997), we will refer to them in the order set out above: (1) is the provision intended to benefit the plaintiff; (2) does the provision impose a binding obligation on the governmental unit; (3) is the interest "too vague and amorphous” for judicial enforcement?

. Chief Justice Rehnquist, joined by Justices O’Connor, Scalia, and Kennedy, dissented. In response to the majority’s argument that the statute conferred substantive rights on health care providers, the dissenters argued that
In light of the placement of § 1396a(a)(13)(A) within the structure of the statute, ... one most reasonably would conclude that § 1396a(a)( 13)(A) is addressed to the States and merely establishes one of many conditions for receiving federal Medicaid funds; the text does not confer any substantive rights on Medicaid services providers. This structural evidence is buttressed by the absence in the statute of any express "focus” on providers as a beneficiaiy class of the provision.
Id. at 527, 110 S.Ct. at 2526-27. The dissenters went on to say that "[e]ven if one were to assume that the terms of [the statute] confer a substantive right on providers ... the statute places its own limitation on that right in very plain language”:
The first step requires the States to make certain findings. The second and only other step requires the States to make certain assurances to the Secretary and the Secretary — not the courts — to review those assurances. Under the logic of our case law, respondent arguably may bring a § 1983 action to require that rates be set according to that process.
Id. at 527-28, 110 S.Ct. at 2527.

. Like the Medicaid Act, the Adoption Assistance and Child Welfare Act establishes a federal reimbursement program for certain expenses incurred by the States. In order to participate in the program and receive reimbursement, the States must submit a plan to the Secretary of Health and Human Services for approval.

. In Pennhurst, the Court considered the question whether the "Bill of Rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act of 1975 conferred upon the mentally retarded substantive rights to "appropriate treatment" in the "least restrictive” environment. Although the Court’s decision specifically did not address the question regarding the enforceability of the provision under § 1983, 451 U.S. at 28 n. 21, 101 S.Ct. at 1545 n. 21, its statements regarding whether the Act created substantive rights are clearly relevant to the inquiry before us today.

. Justice Blackmun, joined by Justice Stevens, dissented, arguing that the majority had deviated from the principles established in the Court’s precedents. In the dissenters’ opinion, the provision established an enforceable federal right under Wilder.

. Various panels of the Seventh Circuit have addressed the appropriate scope of Suter as well as the scope of previous panels' decisions regarding Suter. In Clifton v. Schafer, 969 F.2d 278 (7th Cir.1992), the panel said of Suter:
The Court based its analysis, in large part, on the fact that § 671 (a)(l 5) required only that a state have a plan providing that the state will make "reasonable efforts” to prevent removing a child from his home or to make it possible to return a removed child to his home.. . Nothing in the Adoption Act placed any other specific requirement on the states or defined what "reasonable efforts" might entail.
Id. at 284. A subsequent panel seemed to interpret Clifton to have taken the position that Suter turns on a distinction between statutes explicitly requiring state compliance and statutes requiring that the stale adopt a plan providing for such compliance. Procopio v. Johnson, 994 F.2d 325, 332 (7th Cir.1993). However, other panels have taken a more case-specific reading of Suter and Clifton. See Miller by Miller v. Whitburn, 10 F.3d 1315 (7th Cir.1993); City of Chicago v. Lindley, 66 F.3d 819 (7th Cir.1995).
Similarly, we note that while one Sixth Circuit panel embraced the First Circuit’s reading of Suter, Audette v. Sullivan, 19 F.3d 254 (6th Cir.1994), another panel indicated that were it not bound by the previous decision, it would reject the First Circuit's approach and explain Suter as a decision turning on the vagueness of the "reasonable efforts” obligation. Wood v. Tompkins, 33 F.3d 600, 609 n. 18 (6th Cir.1994). See also Loschiavo v. City of Dearborn, 33 F.3d 548, 551 n. 2 (6th Cir.1994) (noting simply that the Sixth Circuit had joined other circuits in concluding that Suter and Wilder may be "harmonized”), cert. denied, 513 U.S. 1150, 115 S.Ct. 1099, 130 L.Ed.2d 1067 (1995).

. The precise language of the statute, which refers to "any such grounds” applied in Suter, suggests that Congress itself may have been unsure if the Court intended to announce the rule referred to in the statute.

. A State participating in the federal Aid to Families with Dependant Children program must certify that it will operate a child support enforcement program that conforms with Title TVD's requirements and that it will do so pursuant to a plan approved by the Secretary of Health and Human Services. Id. at -, 117 S.Ct. at 1356.

.See 42 U.S.C. § 609(a)(8) (authorizing the Secretary of Health and Human Services to reduce a State’s AFDC grant by up to five percent if the State does not "substantially comply” with the requirements of Title IV-D).

. We note that a district court in Pennsylvania has held that the transportation regulation is enforceable through an action under § 1983. Morgan v. Cohen, 665 F.Supp. 1164, 1175 (E.D.Pa.1987) (relying on Wright v. City of Roanoke Redevelopment and Hous. Auth., 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)).
We also note that in Smith v. Vowell, 379 F.Supp. 139 (W.D.Tex.1974), aff'd, 504 F.2d 759 (5th Cir.1974) (table), the court, in an action brought by Medicaid recipients under § 1983, held Texas’s Medicaid plan to be "out of conformity” with the transportation regulation and ordered the State to submit a conforming plan. However, Smith v. Vowell nowhere addressed the question before us — i.e., is there a "federal right” to transportation enforceable under § 1983? Therefore, the decision has little persuasive effect.

. The Third Circuit has written in dicta that "[w]ith respect to the existence of the private rights requirement, valid federal regulations as well as federal statutes may create rights enforceable under section 1983.” West Virginia Univ. Hospitals, Inc. v. Casey, 885 F.2d 11, 18 (3d Cir.1989) (citing Wright), cert. denied, 496 U.S. 936, 110 S.Ct. 3213, 110 L.Ed.2d 661 (1990). We think it reads far too much into this statement to say that the Third Circuit is in agreement with the Sixth Circuit. See also DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 844 F.2d 714, 724 (10th Cir.1988) ("In at least some instances, violations of rights provided under federal regulations provide a basis for § 1983 suits.”) (dicta).
Similarly, we note that in Clifton v. Schafer, 969 F.2d 278 (7th Cir.1992), the Seventh Circuit, faced with a case in which the plaintiff sued to enforce an obligation expressly imposed only by federal regulation, followed an analytical approach somewhat similar to that taken by the Sixth Circuit. In other words, the panel seemed to look "directly” to the regulation to determine whether the "federal rights” test was met. However, the panel concluded that the regulation, if it created any right, created only a right to insist that the State have a plan making the provision the regulation required (which the plaintiff did not dispute). Id. at 283-84. Therefore, we do not read the decision as a holding agreeing with the Sixth Circuit approach.

. For other cases in the courts of appeals dealing with causes of action relying at least in part on a regulation, see Farley v. Philadelphia Hous. Auth., 102 F.3d 697 (3d Cir.1996); Buckley v. City of Redding, Cal., 66 F.3d 188 (9th Cir.1995); Albiston v. Maine Comm’r of Human Services, 1 F.3d 258 (1st Cir.1993); Howe v. Ellenbecker, 8 F.3d 1258 (8th Cir.1993), cert. denied, 511 U.S. 1005, 114 S.Ct. 1373, 128 L.Ed.2d 49 (1994); and Samuels v. District of Columbia, 770 F.2d 184 (D.C.Cir.1985). While none of these opinions articulates a general approach for dealing with such cases, we suspect that underlying at least some of these decisions are principles similar to those we articulate below. See Farley, 102 F.3d at 699 ("[The] cause of action arises strictly under [the statutory provision]. Regulation § 966.57(b) merely interprets that section.").

. We note that footnote 3 of the majority’s opinion reads in part: "The dissent may have a different view, but to us it is clear that the regulations gave low-income tenants an enforceable right to a reasonable utility allowance and that the regulations were fully authorized by the statute." Id. at 420 n. 3, 107 S.Ct. at 769 n. 3. We think it is possible that the majority here was referring not to the dissent's position on whether the regulation qua regulation could give rise to a "right," but instead to the dissent's position that, even assuming a regulation could create a federal right, the particular regulation at issue was incapable of judicial enforcement. Id. at 438, 107 S.Ct. at 778. In any event, we see no inconsistency between footnote 3 and our interpretation of the majority’s full discussion of the "federal rights” question, and we decline to read into this isolated statement any broader rule than we derive from that discussion.

. In addition to the role for regulations as suggested in Wright, see text infra, the Supreme Court has sometimes looked to the Secretary's understanding of Congressional intent as an interpretive aid in its own judicial effort to ascertain legislative intent. For example, the Pennhurst Court, in rejecting an argument that the "Bill of Rights" provision of the Developmenlally Disabled Assistance and Bill of Rights Act of 1975 imposed a condition on the receipt of federal funds and created substantive rights in favor of the plaintiffs, relied in part on the Secretary's similar understanding of Congressional intent:
Equally telling is the fact that the Secretary has specifically rejected the position of the Solicitor General. The purpose of the Act, according to the Secretary, is merely "to improve and coordinate the provision of services to persons with developmental disabilities.” 45 CFR § 1385.1 (1979). The Secretary acknowledges that "[n]o authority was included in [the 1975] Act to allow the Department to withhold funds from States on the basis of failure to meet the findings [of § 6010].” 45 Fed.Reg. 31006 (1980). If funds cannot be terminated for a State’s failure to comply with § 6010, § 6010 can hardly be considered a "condition" of the grant of federal funds.
Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 23, 101 S.Ct. 1531, 1543, 67 L.Ed.2d 694 (1981). Similarly, the Wilder Court, in holding that there was a binding obligation to actually adopt reasonable and adequate rates, noted inter alia:
The Secretary has expressed his intention to withhold funds if the state plan does not com *1009 ply with the statute or if there is "noncompliance in practice." See 42 CFR § 430.35 (1989) ("A question of noncompliance in practice may arise from the State’s failure to actually comply with a Federal requirement, regardless of whether the plan itself complies with that requirement”).
Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 512, 110 S.Ct. 2510, 2519, 110 L.Ed.2d 455 (1990). Finally, in determining that the relevant statutory provision imposed upon States not a specific binding obligation, but instead a “rather generalized duty,” id. at 363, 112 S.Ct at 1370, the Suter Court wrote:
The regulations promulgated by the Secretary to enforce the Adoption Act do not evidence a view that § 671(a) places any requirement for state receipt of federal funds other than the requirement that the State submit a plan to be approved by the Secretary.
Suter v. Artist M., 503 U.S. 347, 361, 112 S.Ct. 1360, 1369, 118 L.Ed.2d 1 (1992).
In the passages quoted above, the Supreme Court relied in part on administrative understandings of Congressional intent with regard to the scope of the obligation imposed by a federal statute. In the instant situation, it appears that the Secretary has consistently taken the position that States are obligated to ensure necessary transportation to and from providers. See Brief of Amicus Curiae Secretary of Health and Human Services. However, the issue before us is a different one — whether or not Congress intended to confer upon private plaintiffs a federal right enforceable under § 1983. The transportation regulation does not evidence any administrative understanding of Congressional intent as to this point; similarly, we note that the Secretary has expressly declined in this litigation to take any position on this question. To find a federal right to transportation, we would have to accord the transportation regulation an entirely different weight than is evidenced by the Supreme Court’s reliance on regulations as an interpretive aid in ascertaining Congressional intent. . As we describe in detail in the text which follows, in order to find for the plaintiffs, we would have to either rely on the regulation to create a federal right of its own force or derive a federal right from an administrative interpretation that goes beyond defining the content of rights conferred by statute and instead imposes a distinct obligation in order to further the broad objectives underlying the statutory provisions.

. We note that we are uncertain exactly how our understanding of Wright squares with the Fourth Circuit's case law. To the extent that we conclude federal rights must ultimately emanate from either explicit or implicit statutory requirements, we would seem to be in agreement with the Fourth Circuit. However, we are uncertain whether the Fourth Circuit would agree with our conclusion that regulations may further define rights imposed by federal statutes.

. This, of course, assumes that the administrative interpretation is not implicit in the statute. It is clear under Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 112, 110 S.Ct. 444, 451, 107 L.Ed.2d 420 (1989), that "[a] rule of law that is the product of judicial interpretation of a vague, ambiguous, or incomplete statutory provision” may be enforced under § 1983.

. In our subsequent discussion, we assume, expressly without deciding, that the regulation is a valid interpretation of each of the provisions cited. We emphasize that we assume this only for purposes of argument; in each case, determining the validity of the regulation would require application of the analysis set out in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

. In addition to our concern that the provision is insufficiently specific to confer enforceable rights on the plaintiff, we also suspect that such an obligation is “too vague and amorphous” to be capable of judicial enforcement. To ask a court to determine whether a State practice complies with the broad, and sometimes competing, goals of "simplicity of administration” and "the best interests of the recipients" would likely strain judicial competence.
We recognize that the Supreme Court has sometimes looked to regulations in determining whether the interest asserted by the plaintiff is "too vague and amorphous” to be judicially enforceable. For example, the Wright Court, in rejecting a "too vague and ambiguous” argument, wrote; “The regulations ... defining the statutory concept of 'rent' as including utilities have the force of law, ... they specifically set out guidelines that the PHAs were to follow in establishing utility allowances, and they require notice to tenants and an opportunity to comment on proposed allowances.” 479 U.S. at 431, 107 S.Ct. at 774. Similarly, the Wilder Court, in rejecting an argument that the "reasonable and adequate reimbursement” obligation was "too vague and amorphous,” relied in part on the implementing regulations: "As in Wright, the statute and regulations set out factors which a State must consider in adopting its rates....” 496 U.S. at 519, 110 S.Ct. at 2522. We find significant the fact that in each case the statute itself set out a particular right, and the regulation only further defined the content of that right. In our view, the Court's approach in these cases is *1011 closely related to our holding above. We have held that where a statute confers a specific right upon the plaintiff, and a valid regulation further defines or fleshes out the precise content of that right, then the statute “in conjunction with” the regulation may create a federal right as further defined by the regulation. Similarly, the quoted portions of Wright and Wilder suggest that courts can look to regulations to flesh out the precise content of specific rights conferred by statute and, thus, bring those rights within the realm of judicial enforceability. As we have stated above, we simply cannot conclude that § 1396a(a)(19) confers any specific right upon the plaintiffs.

.42 U.S.C. § 671(a)(3) reads: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which ... provides that the plan shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them.”

. The precise distinction between categorically needy recipients and medically needy recipients is a technical one not relevant to the case before us today. For present purposes, it is only necessary to understand that § 1396a(a)(10)(B) is designed to ensure that “categorically needy” recipients — who are, generally speaking, the most needy recipients — receive assistance comparable to the assistance received by other categorically needy recipients and by "medically needy” recipients.

. We assume for the sake of argument only that these provisions create some federal right.

. We note briefly that we do not hold that the State is under no obligation to comply with the transportation regulation. This is simply a different question from the one we decide today.