**WILLIAM T., et al., Plaintiffs,**

v.

**William R. TAYLOR, M.D., et al., Defendants.**

**No. Civ.A. 1:95–2901A–JEC.**

United States District Court, N.D. Georgia, Atlanta Division.

March 1, 2000.

Lewis Golinker, Office of Lewis Golinker, Ithaca, NY, Naomi Tsipora Walker, Georgia Advocacy Office, Decatur, GA, for Plaintiffs.

Kevin Matthew O'Connor, Office of State Attorney General, Atlanta, GA, Philip Brian Campbell, Office of P. Brian Campbell, Roswell, GA, for Defendants.

## ORDER

CARNES, District Judge.

This case is presently before the Court on plaintiffs' Motion for Summary Judgment [56], plaintiffs' Motion to Exceed Page Limitation [58], defendants' Cross–Motion for Summary Judgment [59], defendants' Motion to Exceed Page Limitation [61], plaintiffs' Motion to Enforce the February 5, 1998 Stipulation and Order [62], Lawrence "Kirby" H.'s Motion for Summary Judgement [63], Lawrence "Kirby" H.'s Motion to Intervene [64], plaintiffs' Motion to Exceed Page Limitation [66], defendants' Motion for Authorization to File a Reply to Plaintiffs' Reply Memorandum in Support of Their Motion for Summary Judgment [73], and defendants' Motion for Authorization to File a Sur–

Reply to Plaintiffs' Reply Memorandum in Support of Their Motion for Intervention [78]. The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that plaintiffs' Motion for Summary Judgment [56] should be **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**, plaintiffs' Motion to Exceed Page Limitation [58] should be **GRANTED**, defendants' Cross–Motion for Summary Judgment [59] should be **DENIED**, defendants' Motion to Exceed Page Limitation [61] should be **GRANTED**, plaintiffs' Motion to Enforce the February 5, 1998 Stipulation and Order [62] should be **DENIED**, Lawrence "Kirby" H.'s Motion for Summary Judgement [63] should be **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**, Lawrence "Kirby" H.'s Motion to Intervene [64] should be **GRANTED**, plaintiffs' Motion to Exceed Page Limitation [66] should be **GRANTED**, defendants' Motion for Authorization to File a Reply to Plaintiffs' Reply Memorandum in Support of Their Motion for Summary Judgment [73] should be **GRANTED**, and defendants' Motion for Authorization to File a Sur–Reply to Plaintiffs' Reply Memorandum in Support of Their Motion for Intervention [78] should be **GRANTED**.

## BACKGROUND

This case revolves around the determination of whether "augmentative and alternative communication devices" (hereinafter "ACDs") should be covered under Georgia's medicaid plan pursuant to the Medicaid Act and its regulations. Plaintiffs [1] brought suit pursuant to a number

---

1. Originally, the named plaintiffs were a child, William T., and two adults, Lynne B. and Martha Faye A. In the first amended complaint, an additional child, Kaitlin C., was added as a named plaintiff. Prior to the Court's consideration of plaintiffs' motion for preliminary injunction, the Court dismissed

the case without prejudice to allow the parties to discuss settlement. (Order [22] at 1–2.) Although the parties entered into a stipulation regarding the original plaintiffs, the parties could not totally agree, and the case was re-opened with the parties agreeing on several

of federal statutes but agree that the lawsuit is appropriately analyzed as a 42 U.S.C. § 1983 claim, alleging that the Georgia Department of Medical Assistance's (hereinafter "GDMA") policy violates the Medicaid Act's "reasonable promptness" provision (42 U.S.C. § 1396a(a)(8)), its "reasonable standards" provision (42 U.S.C. § 1396a(a)(17)), and Medicaid's methods and procedures regarding utilization of covered services (42 U.S.C. § 1396a(a)(30)). (Pls.' Reply Br. [65] at 3.) Moreover, plaintiffs assert that GDMA's exclusion of ACDs violates the Medicaid regulations governing the required "amount, duration, and scope" of covered Medicaid services (42 C.F.R. § 440.230(b)-(d)). (*Id.*) Plaintiffs argue that, under the Medicaid Act, GDMA is required to provide ACDs to those determined to have a medical necessity. Through this lawsuit, plaintiffs seek "a declaration that ACDs meet the standards of coverage by Georgia Medicaid, and injunctive relief that prohibits Georgia Medicaid from using any decision making standard for ACD funding requests that is not based on and consistent with current standards of knowledge, policy and practice related to ACD treatment." (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 6.)

Defendants, on the other hand, contend that plaintiffs may not maintain this lawsuit for three reasons. First, defendants argue that plaintiffs lack standing to assert a cause of action pursuant to 42 U.S.C. § 1983 as they are "third-party beneficiaries to a federal-state funding program." (Defs.' Cross–Mot. for Summ. J. [59] at 6.) Second, defendants contend that plaintiffs' claims are barred by the Eleventh Amendment to the United States Constitution. (*Id.* at 12.) Finally, defendants argue that GDMA has wide discretion in determining the amount, duration, and scope of medical care that is provided under its medical program and that because ACDs fall within one of several optional classes of assistance, GDMA has the discretion to limit the services it provides under the given optional classes of assistance. (*Id.* at 18, 20.)

The material facts in this case are not in dispute. The GDMA does not dispute that it has consistently denied funding for ACDs under its Medicaid program. (Defs.' Cross–Mot. for Summ. J. [59] at 3.) Accordingly, the Court is faced solely with a question of law.

ACDs are "electronic and non-electronic devices that allow individuals to overcome, to the maximum extent possible, communication limitations that interfere with their daily activities." (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 1 n. 1.) These devices help individuals communicate who have lost their ability to speak due to a range of medical problems. These problems may include: amyotropic lateral sclerosis (Lou Gehrig's disease), cerebral palsy, multiple sclerosis, cancer, and other medical diagnoses. *See generally* Ellen M. Saideman, *Helping the Mute to Speak: The Availability of Augmentative Communication Devices Under Medicaid,* 17 N.Y.U. Rev. L & Soc. Change 741 (1989/1990).

▮ It is helpful at this point to set out the general description of the Medicaid program. Medicaid is a federal-state partnership, where states can opt to accept federal funds in return for their agreement to provide Medicaid benefits to its citizens. As the Eleventh Circuit has explained:

> Medicaid is a cooperative venture of the state and federal governments. A state which chooses to participate in Medicaid submits a state plan for the funding which is approved by the federal government. The federal government then subsidizes a certain portion of the financial obligations which the state has

new plaintiffs to continue this lawsuit. (Stipulation & Order [29] at 2–3.)

agreed to bear. A state participating in Medicaid must comply with the applicable statute, Title XIX of the Social Security Act of 1965, as amended, 42 U.S.C. § 1396, *et seq.*, and the applicable regulations. *Silver v. Baggiano*, 804 F.2d 1211, 1215 (11th Cir.1986). *See also Harris v. James*, 127 F.3d 993, 996 (11th Cir.1997). A state, like Georgia, which chooses to participate in the federal-state program, must provide certain required services to its citizens. *See Tallahassee Memorial Reg. Med. Ctr. v. Cook*, 109 F.3d 693, 698 (11th Cir. 1997)(per curiam). In addition, the state may elect to provide certain optional services to its citizens. Three of these optional services are at issue in this case: home health care services, prosthetic devices, and speech-language pathology services.[2] It is undisputed that Georgia has elected to cover these services.

The central issue in this case is whether ACDs fit into the three optional services that Georgia has agreed to provide to its citizens. Plaintiffs filed a motion for summary judgment, arguing that ACDs fall into all three of these optional categories, and that, as such, Georgia must provide these services to those who are determined to be medically needy and to those who otherwise qualify for Medicaid. Plaintiffs also ask the Court to fashion injunctive relief. Defendants have also filed a motion for summary judgment, arguing that they are entitled to summary judgment for the three reasons articulated *supra* at 4.

The Court will first address defendants' "defenses" to plaintiffs' claim. As the Court determines that defendants may not prevail on the three "defenses," the Court must then decide whether ACDs fit into the three optional services classifications; it concludes that ACDs do so fit and should be covered under Medicaid. This conclusion does not terminate this litigation, however, as several issues remain to be determined either through negotiation between the parties or through a subsequent order in this case.

## DISCUSSION

### I. *Kirby H.'s Motion to Intervene*

 Lawrence "Kirby" H. has filed a motion to intervene in this action pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, the permissive intervention provision. This rule provides:

> Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

FED. R. CIV. P. 24(b). Because the Court finds that Kirby H. has sufficiently demonstrated that his claims are identical to the claims of the other named plaintiffs in this case and that allowing Kirby H. to intervene will not "unduly delay or prejudice the rights of the original parties," the Court GRANTS Kirby H.'s motion to intervene.[3]

---

**2.** *See* 42 U.S.C. § 1396d(a)(7), (a)(11), & (a)(12) and 42 C.F.R. §§ 440.70, 440.110, & 440.120.

**3.** Defendants contend that Kirby H. failed to file a pleading setting forth his claims. (Defs.' Resp. to Kirby H.'s Mot. to Intervene [71] at 2.) Although it is true that Kirby H. failed to attach a complaint to the motion to intervene, he corrected this error by attaching a proposed complaint with an explanation of his claims to his reply brief. (Kirby H.'s Reply Br. [75] at Ex. A.) Moreover, in this particular case, defendants, who originally denied Kirby H. an ACD and then subsequently affirmed this denial in an administrative hearing, knew exactly what Kirby H.'s claims were and that Kirby H.'s claims are exactly the same as the remainder of the plaintiffs' claims.

Kirby H. has also filed a motion for summary judgment. In this motion, Kirby H. simply incorporates plaintiffs' motion. The Court finds that defendants will not be prejudiced by allowing Kirby H. to join this motion. The Court's decision regarding ACD coverage is not specific to any one plaintiff in this case and does not rely on the facts surrounding any one plaintiff. Moreover, as the Court will eventually remand these plaintiffs for administrative review in consideration of the ACD funding criteria to be developed by the parties to this case, any final order of this Court is not likely to grant specific relief for Kirby H., except to remand his case for further administrative consideration. Accordingly, the Court will consider Kirby H.'s motion for summary judgment in conjunction with plaintiffs' motion.

## II. Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[4] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly proba-

---

4. The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

tive." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's case so as to create a genuine issue for trial.

### III. *Defendants' Cross–Motion for Summary Judgment*

Defendants, in their motion for summary judgment, contend that plaintiffs do not have standing to bring this § 1983 claim arguing that plaintiffs, as third-party beneficiaries to a federal-state Medicaid program, do not have standing to sue under § 1983. In addition, defendants contend that plaintiffs's claims are bared by the Eleventh Amendment. Finally, defendants assert that they are not liable to plaintiffs for the denial of coverage for ACDs because they have inherent discretion to determine the amount, duration, and scope of coverage under the optional classes of assistance they choose to provide pursuant to their Medicaid program. The Court will address each of these defenses in turn.

### A. *Do plaintiffs have standing to pursue their § 1983 claim?*

Taking their cue from Justice Scalia's concurring opinion in *Blessing v. Freestone,* 520 U.S. 329, 349, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), defendants argue that plaintiffs, as third-party beneficiaries to the federal-state Medicaid program, may not bring this lawsuit pursuant to 42 U.S.C. § 1983. In *Blessing,* Justice Scalia penned a concurring opinion that suggested that an individual receiving benefits—or not receiving benefits she feels that she is entitled to receive—under a federal-state funding and spending agreement could not maintain a suit pursuant to § 1983 against the state agency. In this opinion, Justice Scalia first observed that the Court had previously, in *Pennhurst State School &*

*Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), characterized federal-state funding and spending agreements as being "in the nature of a contract" where "[t]he State promises to provide certain services to private individuals, in exchange for which the Federal Government promises to give the State funds." *Blessing,* 520 U.S. at 349, 117 S.Ct. 1353 (quoting *Pennhurst,* 451 U.S. at 11, 101 S.Ct. 1531 (Scalia, J., concurring)). Next, Justice Scalia noted that in the above described situation, the individual was a third-party beneficiary to the federal-state funding and spending contract. Justice Scalia recognized that, at the time § 1983 was enacted, third-party beneficiaries were considered "stranger[s] to the contract, and could not sue upon it." *Id.* Through this reasoning, Justice Scalia suggested that an individual, as a third-party beneficiary, would not have standing to maintain a § 1983 claim against a state for the state's violation of the federal-state spending and funding agreement. *Id.* at 349–50, 117 S.Ct. 1353.

In the instant case, defendants note that plaintiffs are merely third-party beneficiaries to the federal-state Medicaid partnership. Defendants contend that plaintiffs should not be permitted to sue the state pursuant to § 1983 because, at the time that § 1983 was enacted, these plaintiffs would not have been able to assert a third-party beneficiary claim against the state. Accordingly, defendants argue that plaintiffs do not have standing to pursue their claims in this case.

While it is not necessarily unreasonable to use a framework that permits only the federal government, not an individual applicant for benefits, to seek to enforce the "contract" between the States and the federal government, this Court could find no other court that has followed Justice Scalia's suggestion and applied it to bar plaintiffs from bringing suit under § 1983

against a state to vindicate rights guaranteed in a federal-state spending and funding agreement. Moreover, as the Eleventh Circuit has permitted plaintiffs to bring suit under § 1983 to redress their federal rights under Medicaid, the Court concludes that plaintiffs in the instant case may likewise maintain their § 1983 causes of action. *See Doe v. Chiles*, 136 F.3d 709, 719 (11th Cir.1998)(finding federal right to reasonably prompt provision of assistance under § 1396a(a)(8) of the Medicaid Act enforceable under § 1983). Accordingly, the Court DENIES defendants' motion for summary judgment as to this ground, finding that, until the Eleventh Circuit or Supreme Court rules otherwise, plaintiffs have adequate standing to present their § 1983 claims.

B. *Are plaintiffs' claims barred by the Eleventh Amendment?*

 Defendants argue that plaintiffs may not sue the state or a state official in federal court pursuant to the Eleventh Amendment. Although it is clear that the Eleventh Amendment protects states and their officials from suit in federal court, a state official may be sued for prospective injunctive relief to "end a continuing violation of federal law." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)(citing *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Plaintiffs here have properly brought this lawsuit against Dr. Taylor in his official capacity [5] as the Commissioner of GDMA for prospective injunctive relief—and not for retroactive monetary damages—in an attempt to prohibit defendant's continuing categorical prohibition of Medicaid coverage for ACDs and to insure that, in the future, Medicaid will provide coverage for ACDs when other pertinent requirements of the Medicaid statute are met by the applicants. Accordingly, the Court concludes that the Eleventh Amendment does not bar plaintiffs' suit against Dr. Taylor.[6] *See Hunter v. Chiles*, 944 F.Supp. 914, 916

---

**5.** Plaintiffs also bring the suit against GDMA. The *Ex parte Young* exception, as explained *infra* note 6, does not apply to a state agency, however, and as such, the Court DISMISSES GDMA as a separate defendant in this case.

**6.** Defendants argue at length that the *Ex parte Young* exception should not apply in this case. The *Ex Parte Young* exception is a qualification to the general rule that Eleventh Amendment sovereign immunity bars suits brought against a state by a state's own citizens and bars suits brought against a state premised on federal questions. *See Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). Under this exception, the Supreme Court has recognized that plaintiffs may maintain certain suits seeking declaratory and injunctive relief against state officers in their individual capacities as long as plaintiffs properly allege a "continuing violation of federal law." *Id. See also Alden v. Maine*, 527 U.S. 706, 119 S.Ct. 2240, 2263, 144 L.Ed.2d 636 (1999) and *Seminole Tribe*, 517 U.S. at 73, 116 S.Ct. 1114.

Specifically, defendants contend that the *Ex Parte Young* exception should not apply because Congress, in the Medicaid statute, has enacted a remedial scheme, allowing rejected Medicaid applicants the opportunity for a full and fair hearing before the state agency. (Def.'s Cross–Mot. for Summ. J. [59] at 15–16.) The remedial scheme, defendants contend, also permits an unsuccessful Medicaid applicant to appeal an administrative agency's adverse decision and provides for procedural safeguards throughout the appeals process. (*Id.* at 16–17.) In *Seminole Tribe*, the Court found that the Indian Gaming Regulatory Act contained a remedial scheme that provided the exclusive remedy for a tribe's enforcement of the act, thereby barring the tribe's federal lawsuit even though the tribe only sought prospective injunctive relief pursuant to the *Ex parte Young* exception to the Eleventh Amendment. 517 U.S. at 75–76, 116 S.Ct. 1114. The Court held that "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*" *Id.* at 74, 116 S.Ct. 1114.

(S.D.Fla.1996)(holding that *Ex parte Young* exception applied to plaintiffs' suit for prospective injunctive relief against state official who denied Medicaid coverage to plaintiffs who had requested ACDs to allow them to communicate verbally). Defendants' motion for summary judgment as to this ground is **DENIED**.

## C. Does GDMA have discretion to deny coverage for ACDs?

██ Defendants' final contention is that because the service categories under which plaintiffs' make their claim—i.e., home health services, prosthetic devices, and speech-language pathology services—are not required services but rather optional services, they have ample discretion to determine the amount, scope, and duration of any coverage that they offer for ACDs and thus can categorically limit the ACD services they provide, whenever they deem it desirable to do so.[7] (Defs.' Cross–Mot. for Summ. J. [59] at 19–20.) To support this contention, defendants cite several federal court decisions. Defendants do not, however, offer more than a cursory discussion of each of the cited cases—typically quoting a particular choice phrase from each case—and they do not discuss the particular claims made in those cases. (Defs.' Cross–Mot. for Summ. J. [59] at 21–24.) Moreover, these cases do not come close to the holding for which defendants cite them: to wit, that a state may make a categorical determination to exclude a particular type of treatment.[8]

Defendants have not, however, been able to point to any case where a court refused to allow a plaintiff to bring suit for prospective injunctive relief under the Medicaid act pursuant to the *Ex parte Young* doctrine. Indeed, plaintiffs correctly cite an Eleventh Circuit decision that specifically rejected a state's Eleventh Amendment defense to a claim to enforce the Medicaid provisions through the issuance of prospective injunctive relief. *See Doe v. Chiles*, 136 F.3d 709, 719–21 (11th Cir.1998). In addition, plaintiffs have cited several cases where other courts have specifically permitted plaintiffs to sue to redress a state official's policy to grant Medicaid coverage to a class of individuals. *See Fred C. v. Texas Health & Human Servs. Com'n*, 988 F.Supp. 1032 (W.D.Tex.1997), *aff'd*, 167 F.3d 537 (5th Cir.1998) and *Hunter v. Chiles*, 944 F.Supp. 914, 916 (S.D.Fla.1996). In light of this showing, the Court is unpersuaded by defendants' argument and finds that the *Ex parte Young* exception should apply to plaintiffs' claims.

7. Defendants make a similar, but more explicitly bold, contention that simply because the services at issue in this case fall into the optional services, as opposed to the required services, the state is permitted to deviate from the federal regulations regarding the provision of that service whenever the State wishes. The Eleventh Circuit has recently reiterated that "when a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to requirements of federal law." *Doe v. Chiles*, 136 F.3d 709, 713 (11th Cir.1998)(quoting *Tallahassee Memorial Reg. Ctr. v. Cook*, 109 F.3d 693, 698 (11th Cir.1997)(per curiam)).

8. *See Alexander v. Choate*, 469 U.S. 287, 309, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)(finding that Tennessee's limitations on number of days of hospital coverage does not "deny the handicapped access to or exclude them from the particular package of Medicaid services Tennessee has chosen to provide"); *Ellis v. Patterson*, 859 F.2d 52, 54–55 (8th Cir.1988)(finding that, in general, states may not automatically deny necessary medical service to Medicaid recipient but that organ transplants may be properly excluded from coverage pursuant to special statute specifically addressing organ transplant coverage); *Sandefur v. Cherry*, 718 F.2d 682, 684 (5th Cir.1983)(suit by optometrists challenging Medicaid statute's distinction regarding reimbursement to optometrists as being less than the reimbursement to ophthalmologists); *Charleston Memorial Hosp. v. Conrad*, 693 F.2d 324, 329 (4th Cir.1982) (suit by hospital challenging reduction of number of covered days permitted per year); and *Curtis v. Taylor*, 625 F.2d 645, 652 (5th Cir.1980)(finding that Florida could legally limit the number of doctor's visits per month as this restriction did not "single out for unique treatment" a

In addition, plaintiffs carefully and persuasively distinguish each of the cases cited by defendants to support their contention that they have the authority to limit the types of optional services rendered. (Pls.' Reply Br. [65] at 24–30.) Plaintiffs have succeeded in demonstrating that each of the cases cited by defendants in their brief either do not address the type of categorical denial involved in the instant case or deal with providers who are seeking reimbursement from the state.

Moreover, plaintiffs contend that although states can limit the definition of medically necessary to exclude certain treatments that are, inter alia, experimental in nature, states are not permitted to categorically exclude specific types of treatment under their broad discretion to determine the amount, duration, and scope of services provided. (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 13–18). Plaintiffs cite numerous cases to support this contention.[9] See e.g. Rush v. Parham, 625 F.2d 1150, 1157 n. 12 (5th Cir.1980). In Rush,[10] a panel of the former Fifth Circuit held that under the Medicaid statutes, Georgia could define medical necessity "in a way tailored to the requirements of its own Medicaid program," thereby limiting

the scope of its coverage. Id. at 1155. Pursuant to this holding, the state could tailor its definition of medically necessary to exclude experimental treatment, such as the sex reassignment surgery at issue in that case. Id. at 1156. The panel cautioned, however, that Georgia could not adopt a policy that categorically denied coverage for sex reassignment surgery. Id. at 1157 n. 12.

Finally, plaintiffs present a policy letter dated September 4, 1998, from Sally K. Richardson, Director of Health Care Financing Administration (hereinafter "HCFA") Center for Medicaid and State Operations, supporting their position. In this letter, Ms. Richardson writes:

> As you know, the mandatory home health services benefit[11] under the Medicaid program includes coverage of medical supplies, equipment, and appliances suitable for use in the home (42 C.F.R. § 440.70(b)(3)). A state may establish reasonable standards, consistent with the objectives of the Medicaid statute, for determining the extent of such coverage (42 U.S.C. § 1396(a)(17)) based on such criteria as medical necessity or utilization control (42 C.F.R. § 440.230(d)). In doing so, a State must ensure that

---

particular medical treatment and pursuant to Florida's plan "[a]ll medical conditions are treated equally"). See also Warr v. Horsley, 705 F.Supp. 540 (M.D.Ala.1989); Virginia Hosp. Assoc. v. Kenley, 427 F.Supp. 781 (E.D.Va.1977); and D.C. Podiatry Society v. District of Columbia, 407 F.Supp. 1259 (D.D.C.1975).

**9.** In general, plaintiffs cite cases dealing with states' attempts to refuse or limit the funding of abortions. Courts have consistently held that states must. determine that abortions should not be funded due to the fact that they are not medically necessary on a case-by-case basis and cannot categorically deny coverage for all abortions or limit the coverage to only those abortions necessary to save the mother's life. See Planned Parenthood Affiliates of Mich. v. Engler, 73 F.3d 634, 638 (6th Cir.

1996); Hope Med. Group for Women v. Edwards, 63 F.3d 418, 427 (5th Cir.1995); Elizabeth Blackwell Health Ctr. for Women v. Knoll, 61 F.3d 170 (3d Cir.1995); Little Rock Family Planning Serv., P.A. v. Dalton, 60 F.3d 497 (8th Cir.1995); Hern v. Beye, 57 F.3d 906 (10th Cir.1995); and Preterm, Inc. v. Dukakis, 591 F.2d 121 (1st Cir.1979).

**10.** This case is binding on the Court. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)(en banc)(adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

**11.** As mentioned supra and discussed more thoroughly infra, this class of services is one of the classes of services that plaintiffs contend ACDs fall into.

the amount, duration, and scope of coverage are reasonably sufficient to achieve the purpose of the service (42 C.F.R. § 440.230(b)). Furthermore, a State may not impose arbitrary limitations on mandatory services, such as home health services, based solely on diagnosis, type of illness, or condition (42 C.F.R. § 440.230(c)).

An ME [medical equipment] policy that provides no reasonable and meaningful procedure for requesting items that do not appear on a State's pre-approved list, is inconsistent with the federal law discussed above. In evaluating a request for an item of ME, a State may not use a "Medicaid population as a whole" test, which requires a beneficiary to demonstrate that, absent coverage of the item requested, the needs of "most" Medicaid recipients will not be met. This test, in the ME context, establishes a standard that virtually no individual item of ME can meet. Requiring a beneficiary to meet this test as a criterion for determining whether an item is covered, therefore, fails to provide a meaningful opportunity for seeking modifications of or exceptions to a State's pre-approved list. Finally, the process for seeking modifications or exceptions must be made available to all beneficiaries and may not be limited to sub-classes of

the population (e.g., beneficiaries under the age of 21).

(Pls.' App. of Unpublished Mats. [56] at Ex. 7 ("HCFA Policy Letter") at 1 (footnote added).) This letter fully supports plaintiffs' contention that states may not categorically deny coverage for a particular service. In this letter, Ms. Richardson explains that a state may not maintain an *exclusive* pre-approved list of medical equipment to make coverage determinations. Rather, the state must have a process whereby an applicant may seek coverage of an item not specifically listed.

A well-established and communicated administrative practice, agency transmittals promulgated by HCFA are apparently entitled to the same deference as HCFA's formal regulations.[12] *See Falken v. Glynn Co.*, 197 F.3d 1341, 1350 (11th Cir.1999); *Georgia Dept. of Med. Assist. v. Shalala*, 8 F.3d 1565, 1571 n. 8 (11th Cir.1994). Assuming that this Court must show some deference to HCFA's reasonable interpretation, as reflected in the above letter, however, the Court further notes that the letter reflects a reasonable interpretation of the law and that it forecloses defendants' contention. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993); *see also Planned Parenthood Affiliates of Mich.*, 73 F.3d at 638 (according great deference to letter from Ms. Richardson to all state

**12.** This Court is somewhat skeptical about according a letter the same deference as a regulation. In this Court's experience, letters written by officials in a bureaucracy are sometimes inconsistent with each other and have not undergone the focus of a review and comment process that accompanies the promulgation of a regulation. *Chevron's* deference toward an administrative agency's interpretation already gives that agency great power in effectively acting as a legislative body; further deferring to the agency's letters interpreting its own regulations arguably expands *Chevron* beyond its own language and beyond the limits of prudence. Indeed, the

Eleventh Circuit has noted that "a rule would be preferable," but has also tempered this observation with a recognition that "the agency is not required to promulgate rules pursuant to every subsection of the widely-acknowledged complex Medicaid statute." *Georgia Dept. of Med. Assist. v. Shalala*, 8 F.3d 1565, 1571 n. 8 (1994). The Eleventh Circuit has further held that this is especially true when "HCFA spoke directly to the states on this question through [a transmittal], which we recognize as administrative practice." *Id.* Accordingly, the Court believes that it must defer to the transmittal letter in question.

Medicaid directors under *Good Samaritan Hospital*). Accordingly, the Court **DE-NIES** defendants' motion for summary judgment on this ground, as well.

## IV. *Plaintiffs' Motion for Summary Judgment*

In their motion for summary judgment, plaintiffs contend that defendants are violating three statutory and one regulatory provision of Medicaid. As an initial matter, the Court must determine whether plaintiffs have validly stated a § 1983 claim—that is, have plaintiffs asserted violations of their federal rights. Next, the Court must determine whether ACDs fit into the three optional service classifications that Georgia has agreed to cover.

### A. *Have plaintiffs asserted violations of federal rights?*

Until the Supreme Court's 1980 decision in *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), § 1983 was used primarily to secure remedies for violations of constitutional rights. In *Thiboutot,* the Supreme Court declared that § 1983 provides a remedy for violations of rights secured by federal statutes as well.[13] The Supreme Court quickly limited *Thiboutot* in a pair of 1981 decisions. *See Middlesex County Sewerage Auth. v. Nat'l*

*Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

As a result, in order for a cause of action under § 1983 to exist for the violation of a federal statute, the federal statute must create private rights enforceable under § 1983. *Pennhurst*, 451 U.S. at 28, 101 S.Ct. 1531. That is, the plaintiff must assert a violation of a federal right, not merely a violation of federal law. *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). In *Blessing,* the Court explained the three-factor test to determine whether a plaintiff has asserted the violation of federal law:

> In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law. We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial compe-

---

13. In *Thiboutot,* the Supreme Court read the language of § 1983, which allows a right of action for the deprivation of any rights "secured by the Constitution *and laws*," to include violations of rights secured by federal statute. In his dissent, Justice Powell, joined by Chief Justice Burger and Justice Rehnquist, argued vehemently that Congress had not intended to provide a new remedy for violations of all federal statutes—or, for that matter, recovery of attorney's fees—and that such an expansive reading of the statute would have far-reaching effects. *Thiboutot,* 448 U.S. at 11–12, 100 S.Ct. 2502 (Powell, J., dissenting). He expressed concern that this holding would "dramatically expand the liability of state and local officials" and might

"virtually eliminate the 'American Rule' in suits against those officials." *Id.* at 12, 100 S.Ct. 2502. Justice Powell further noted that § 1983 claims were already being "appended to complaints solely for the purpose of obtaining fees in actions where 'civil rights' of any kind are at best an afterthought." *Id.* at 11–12, 24, 100 S.Ct. 2502. He concluded that the majority's decision "significantly expands the concept of 'civil rights' and creates a major new intrusion into state sovereignty under our federal system." *Id.* at 33, 100 S.Ct. 2502. Nearly twenty years later, it is all too clear that Justice Powell's predictions were well-founded. Litigation under § 1983 proliferates throughout federal dockets around the country.

tence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Id.* at 340–41, 117 S.Ct. 1353 (citations omitted).[14] *See also Doe v. Chiles,* 136 F.3d 709, 713 (11th Cir.1998). The Supreme Court has emphasized, however, that a court should not "lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy" for the deprivation of a federally secured right. *Smith v. Robinson,* 468 U.S. 992, 1012, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984).

In the instant case, plaintiffs claim that "jurisdiction pursuant to 42 U.S.C. § [1983] is based on Medicaid's violations of 42 U.S.C. § 1396a(a)(8), the Medicaid Act's 'reasonable promptness' provision, § 1396a(a)(17), its 'reasonable standards' provision, and § 1396a(a)(30) which addresses, inter alia, the methods and procedures Medicaid programs employ regarding utilization of covered services." (Pls.' Reply Br. [65] at 3.) In addition to these statutory violations, plaintiffs also "assert Medicaid's exclusion of ACDs violates the Medicaid regulations governing the required 'amount, duration and scope' of covered Medicaid services, 42 C.F.R. § 440.230(b)-(d)." *(Id.)* The Court will address each statutory and regulatory claim in turn to determine if plaintiffs have satisfied their burden of alleging a violation of a federal right. The Court must undertake this inquiry prior to determining the question of whether ACDs should be covered under any of the optional services that Georgia has opted to provide its Medicaid-eligible citizens.

1. *"Reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8)*

Title 42 U.S.C. § 1396a(a)(8) requires that a state plan for medical assistance must "provide that all individuals wishing to make application for medical assistance under the plan shall have an opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." Plaintiffs claim that GDMA violates this provision by categorically denying coverage for ACDs. Specifically, plaintiffs explain that GDMA "violates these provisions by creating administrative barriers to ACD access for persons who are dually eligible for Medicaid and Medicare, and by mis-applying the Medicaid Act's 'third party liability' or 'payer of last resort' provisions to deny ACD funding requests for children participating in the Early Intervention program or who attend public school, and for residents of nursing facilities."[15] (Pls.' Reply Br. [65] at 4.) Defen-

14. This inquiry involves a shifting burden of proof. "Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress 'specifically foreclosed a remedy under § 1983.' Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353 (citation omitted)(quoting *Smith v. Robinson,* 468 U.S. 992, 1005, n. 9, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)). *See also Livadas v. Bradshaw,* 512 U.S. 107, 133, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994).

15. In their opening brief, plaintiffs explain that GDMA misuses the "payer of last resort" or "third party liability" theories to deny those who apply for ACDs speedy access to ACDs by issuing "a determination that other agencies are responsible to provide funding for ACDs." (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 43–46.) Moreover, plaintiffs explain that GDMA will not cover ACDs for those dually eligible for Medicaid and Medicare, as GDMA requires that those eligible must first file with Medicare before Medicaid

dants do not address this issue.

Recently, in *Doe v. Chiles*, the Eleventh Circuit concluded, after rigorously applying *Blessing*'s three-factor test, that individuals "have a federal right to reasonably prompt provision of assistance under section 1396a(a)(8) of the Medicaid Act, and that this right is enforceable under section 1983." *Doe*, 136 F.3d at 719. Accordingly, plaintiffs have adequately demonstrated that the Court has jurisdiction to address plaintiffs' claims under this statutory provision.

### 2. Reasonable Standards Provision, 42 U.S.C. § 1396a(a)(17)

Title 42 U.S.C. § 1396a(a)(17) requires that a state plan for medical assistance must "include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter." Plaintiffs argue that plaintiffs have a federal right to have states include in their state Medicaid plan reasonable standards for the determination of eligibility for and the extent of medical assistance and, thus, individuals should be permitted to enforce this right pursuant to § 1983. (Pls.' Reply Br. [65] at 6.) In the instant case, plaintiffs contend that GDMA violates this provision "by excluding ACDs from coverage under the DME [durable medical equipment], prosthetic devices and/or SLP [speech-language pathology] service benefits; by asserting [that] ACDs are not medically necessary; by failing to ensure [that] funding decisions are consistent with current standards of SLP and AAC [augmentative and alternative communication devices] intervention; by not employing a skilled decision maker; and by not utilizing consis-

tent coverage criteria related to ACD funding requests." (*Id.*) Defendants do not address this issue.

Although the Court has located one appellate court decision that assumed, for the purposes of deciding the case, that § 1983 provides a private right of action for a state's violation of § 1396a(a)(17), plaintiffs cite, and the Court could only locate, one case, *Smith v. Palmer*, 24 F.Supp.2d 955 (N.D.Iowa 1998), in which a court actually addressed the precise issue. *Compare Addis v. Whitburn*, 153 F.3d 836, 840 n. 2 (7th Cir.1998) (assuming that § 1983 claims to redress state's violation of § 1396a(a)(17) properly brought) *with Smith*, 24 F.Supp.2d at 963 (finding that plaintiffs had federally enforceable right under § 1396a(a)(17) that could be asserted under § 1983).

In *Smith*, Judge Bennett addressed the Supreme Court's test for the enforceability of a federal statutory right under § 1983 by first determining that the plaintiff, a disabled recipient of Medicaid who receives medical assistance under Iowa's plan, was an intended beneficiary of the "reasonable standards" requirement of § 1396a(a)(17). *Smith*, 24 F.Supp.2d at 963. Judge Bennett had little trouble determining that the plaintiff was an intended beneficiary of the federal Medicaid provision, recognizing that "the primary purpose of [M]edicaid is to achieve the praiseworthy social objective of granting health care coverage to those who cannot afford it." *Id.* (quoting *West Virginia Univ. Hosp., Inc. v. Casey*, 885 F.2d 11, 20 (3d Cir.1989)). Secondly, Judge Bennett determined that the right created in § 1396a(a)(17) is "neither vague nor amorphous and is well within the realm of

---

will even consider their applications. (*Id.* at 48.) Plaintiffs contend that this creates an impossible situation for those applying for ACDs, as Medicare, being a cost-reimburse-

ment program, requires delivery of the device prior to reimbursement. As such, those is need of ACDs who cannot afford them cannot receive ACDs promptly. (*Id.*)

those rights the judiciary can enforce."
*Id.* (citing *Loschiavo v. City of Dearborn*,
33 F.3d 548, 552–53 (6th Cir.1994) ("A
regulation is not rendered impermissibly
vague simply because it calls for a judicial
determination of reasonableness.")). Fi-
nally, Judge Bennett concluded that the
mandatory language in § 1396a(a)(17)
"imposes a binding obligation on states
choosing to participate in the Medicaid
program." *Id.* at 964.

In light of the Eleventh Circuit's willing-
ness in *Doe* to find an enforceable federal
right in the similar "reasonable prompt-
ness" provision of § 1396a(a)(8), the Court
finds Judge Bennett's reasoning persua-
sive and concludes that plaintiffs have es-
tablished a rebuttable presumption that
their statutory right is enforceable under
§ 1983. *See Doe*, 136 F.3d at 718–19.
More importantly, defendants have not at-
tempted to rebut this presumption. Ac-
cordingly, the Court finds that plaintiffs
may attempt to enforce their federal right
under § 1396a(a)(17), pursuant to § 1983.

3. *Equal access provision, 42 U.S.C.
§ 1396a(a)(30)*

■■■ Title 42 U.S.C. § 1396a(a)(30)(A)
requires that a state plan for medical as-
sistance

> provide such methods and procedures
> relating to the utilization of, and the
> payment for, care and services available
> under the plan ... as may be necessary
> to safeguard against unnecessary utiliza-
> tion of such care and services and to
> assure that payments are consistent
> with efficiency, economy, and quality of
> care and are sufficient to enlist enough

providers so that care and services are
available under the plan at least to the
extent that such care and services are
available to the general population in the
geographic area.

Plaintiffs assert that defendants violate
this provision by their "failure to establish
reasonable coverage criteria for ACD eligi-
bility; its failure to use a decision maker
who has knowledge about SLP and ACD
treatment principles, and its failure to
make ACD eligibility decisions that are
consistent with currently accepted stan-
dards of practice." [16] (Pls.' Reply Br. [65]
at 10.) Plaintiffs contend that this section
confers § 1983 jurisdiction. Moreover,
plaintiffs cite to several cases which, after
applying the three-factor test to determine
a federal statute's enforceability pursuant
to § 1983, determined that this section
may be enforced by a Medicaid recipient
or provider through a § 1983 action. (Pls.'
Reply Br. [65] at 10–11.) [17] Once again,
defendants fail to respond to plaintiffs'
contention regarding the enforceability of
this statute.

In *Arkansas Medical Society, Inc. v.
Reynolds*, 6 F.3d 519, 528 (8th Cir.1993), a
panel of the Eighth Circuit determined
that, pursuant to the Supreme Court's
test, the equal access provision was a fed-
eral right enforceable under § 1983.
First, the panel determined, "The equal
access provision is indisputably intended to
benefit the recipients by allowing them
equivalent access to health care services."
*Id.* at 526. Second, the panel determined
that the mandatory language of the provi-
sion, "[a] State plan for medical assistance

---

**16.** In their reply brief, plaintiffs admit that
"[a]s a general matter, Plaintiffs' claims un-
der Section 1396a(a)(17) overlap with those
related to Section 1396a(a)(30)." (Pls.' Reply
Br. [65] at 10.)

**17.** *See Visiting Nurse Ass'n. of North Shore,
Inc. v. Bullen*, 93 F.3d 997, 1004 (1st Cir.

1996); *Methodist Hosps., Inc. v. Sullivan*, 91
F.3d 1026 (7th Cir.1996); *Arkansas Med.
Soc'y, Inc. v. Reynolds*, 6 F.3d 519 (8th Cir.
1993); *Moody Emerg. Med. Serv., Inc. v. City
of Millbrook*, 967 F.Supp. 488 (M.D.Ala.1997);
and *Fulkerson v. Commissioner, Me. Dep't of
Human Servs.*, 802 F.Supp. 529 (D.Me.1992).

*must*," is sufficient to "create a binding obligation on the state." *Id.* (emphasis added)(citing 42 U.S.C. § 1396a). Finally, the panel found that the statute was not too vague and amorphous to enforce a right via § 1983 because of the clear legislative history of the statute which serves to clarify the section. *Id.* at 527.

Particularly in view of the absence of opposition by defendants to this contention by plaintiff, the Court finds the Eighth Circuit's reasoning to be persuasive. Accordingly, the Court concludes that plaintiffs have established a rebuttable presumption that their statutory right is enforceable under § 1983. *See Doe,* 136 F.3d at 718–19. As noted *supra,* defendants have not attempted to rebut this presumption, and as such, the Court determines that plaintiffs may enforce their federal right under § 1396a(a)(17) against defendants pursuant to § 1983.

4. *"Amount, duration, and scope" regulation, 42 C.F.R. § 440.230(b)*

▮ Title 42 C.F.R. § 440.230(b) provides that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." Plaintiffs contend that because § 1396a(a)(17), the section that § 440.230(b) helps define, confers § 1983 jurisdiction, the regulation may also confer § 1983 jurisdiction. (Pls.' Reply Br. [65] at 12.) Plaintiffs cite to the Eleventh Circuit case of *Harris v. James,* 127 F.3d 993 (11th Cir.1997) for this proposition. In a footnote, defendants cite the identical case for the proposition that it is "an open question as to whether federal rights are created by regulations." (Defs.' Cross–Mot. for Summ. J. [59] at 25 n. 6.)

In *Harris,* a panel of the Eleventh Circuit determined that a federal regulation, in conjunction with a statutory provision that creates a federal right under the three-prong test, could create a federal right enforceable under § 1983. *Harris,*

127 F.3d at 1008–09. Indeed, the panel observed, *"Wright [v. Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) ] would seem to indicate that so long as the statute itself confers a specific right upon the plaintiff, and a valid regulation merely further defines or fleshes out the content of that right, then the statute-'in conjunction with the regulation'-may create a federal right as further defined by the regulation." *Id. See also Doe,* 136 F.3d at 717 (finding that § 1396a(a)(8) as further fleshed out by its regulations creates federal right to reasonably prompt assistance). In so holding, the panel expressly rejected "the Sixth Circuit's approach-i.e., finding a 'federal right' in any regulation that in its own right meets the three-prong 'federal rights' test." *Harris,* 127 F.3d at 1008.

Accordingly, the Court finds that the regulation itself may not confer a federal right actionable under § 1983. The regulation does, however, "further define the contours of the statutory right" to reasonable standards as enunciated in § 1396a(a)(17). *Doe,* 136 F.3d at 717. As such, the right to reasonable standards must be defined in the context of its interpretive regulation requiring states to promulgate reasonable standards that ensure that provided services are "sufficient in amount, duration, and scope." *See Smith,* 24 F.Supp.2d at 966. Thus, the regulation, while not conferring § 1983 jurisdiction on its own, may be utilized by plaintiffs to define their claim under § 1396a(a)(17).

B. *Do ACDs fit into the coverage criteria under the three optional service classifications?*

Plaintiffs have persuasively presented a thoroughly researched brief arguing that ACDs meet the coverage criteria of three optional service classifications. Indeed,

plaintiffs note that 47 states currently cover ACDs.[18] Moreover, in each of the eighteen cases to have addressed the ACD coverage question, "no final decision has permitted a Medicaid program to exclude ACDs in general, or for any sub-populations of Medicaid recipients." (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 21; Pls.' Affs. [57] at Ex. 9 at ¶¶ 4–26.) Of these cases, four involve federal courts which determined that ACDs must be covered by state Medicaid plans. *See Meyers v. Reagan,* 776 F.2d 241 (8th Cir.1985); *Fred C. v. Texas Health & Human Servs. Comm'n,* 988 F.Supp. 1032 (W.D.Tex.1997), *aff'd,* 167 F.3d 537 (5th Cir.1998); *Hunter v. Chiles,* 944 F.Supp. 914 (S.D.Fla.1996); and *Myers v. Mississippi,* No. 3:94–CV–185–LN (S.D. Miss. June 23, 1995).

Defendants, on the other hand, have not addressed plaintiffs' contentions regarding ACD coverage.[19] Indeed, defendants have had ample opportunity, in either their cross-motion for summary judgment or their sur-reply brief in opposition to plaintiffs' motion for summary judgment, to address plaintiffs' contentions, but instead, defendants chose to address the issues of standing, Eleventh Amendment immunity, and their Medicaid-related defense that they have discretion to determine the amount, duration, and scope of coverage. As discussed *supra,* the Court has rejected defendants' positions on these issues. In effect, then, the State does not oppose plaintiffs' contention that ACDs should be covered under Georgia's plan for medical assistance. In spite of this fact, the Court will briefly discuss plaintiffs' position.

Plaintiffs contend that ACDs fit into three covered benefit categories. As discussed *supra,* Georgia has opted to cover these three optional services at issue in this case: home health care services, prosthetic devices, and speech-language pathology services.[20] The Court will address whether ACDs fit into each of these optional service classifications.

### 1. *Home health care services*

Plaintiffs assert that ACDs may properly be considered as meeting the criteria for "home health care services."[21] The Medicaid statute specifically includes "home health care" among the optional services which includes "durable medical equipment." 42 U.S.C. § 1396d(a)(7). The federal regulations explain that this requirement includes, "Medical supplies, equipment, and appliances suitable for use in the home." 42 C.F.R. § 440.70 (1998). *See Fred C.,* 988 F.Supp. at 1035; *Hunter,* 944 F.Supp. at 919. "The term durable medical equipment has no federal Medicaid definition." *Fred C.,* 988 F.Supp. at 1035. GDMA, however, defines the term in its policy manual as items that meet the following criteria:

902.1 The equipment must be appropriate for home use.

902.2 The equipment must be able to withstand repeated use.

---

**18.** Plaintiffs note that Georgia and Hawaii are the only states to actively deny coverage for ACDs. Litigation is pending in each state challenging the denials. The other state, Rhode Island, has not had the opportunity to address this issue at this time. (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 21 & n. 54.)

**19.** *See infra* n. 22 (identifying the single argument that defendants make in opposition to classifying an ACD within the category of home health care).

**20.** *See* 42 U.S.C. § 1396d(a)(7), (a)(11), & (a)(12) and 42 C.F.R. §§ 440.70, 440.110, & 440.120.

**21.** Indeed, plaintiffs note that 24 states currently classify ACDs as durable medical equipment, a subclass of home health care services. (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 23.)

902.3 The equipment must be medically necessary.

902.4 The equipment must have a warranty.

(Pls.' Exs. [56] at Ex. 2 at §§ 902.1–902.4.) Plaintiffs contend that ACDs meet each of these criteria. Defendants do not contradict this contention.[22] (Defs.' Cross–Mot. for Summ. J. [59] at 28.) Accordingly, the Court finds that ACDs properly meet the criteria for being considered durable medical equipment and must be covered for an otherwise eligible Medicaid recipient who is deemed to have a medical necessity under Georgia Medicaid.

### 2. Prosthetic devices

■ Plaintiffs also contend that ACDs may be properly considered a prosthetic device, a service which Georgia has opted to cover under its plan for medical assistance.[23] See 42 U.S.C. § 1396d(a)(12). Prosthetic devices are specifically defined in the federal regulations as:

replacement, corrective, or supportive devices prescribed by a physician or other licensed practitioner of the healing arts within the scope of his practice as defined by State law to-

(1) Artificially replace a missing portion of the body;

(2) Prevent or correct physical deformity or malfunction; or

(3) Support a weak or deformed portion of the body.

42 C.F.R. § 440.120(c) (1998). Plaintiffs argue

ACDs clearly satisfy the second sub-¶ of the federal Medicaid definition. The benefits provided by prosthetic devices are a precise match with those provided by ACDs: ACDs correct physical malfunction by replacing the functions of the brain, nerve pathways, and organs of speech, which when unimpaired, yield intelligible speech.

(Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 27–28.)

Plaintiffs also cite to the district court's decision in *Fred C.*, in which the court determined that "the ACD is a prosthetic device which should be provided to [plaintiff]." 988 F.Supp. at 1037. Finally, plaintiffs note that numerous HCFA policy letters on ACDs "identify prosthetic devices as one of the possible benefit categories within which they can be classified." (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 28 n. 78 & 22 n. 58.)

As defendants do not address plaintiffs' contention that ACDs meet the criteria for prosthetic devices, it appears as if they do not oppose plaintiffs' motion in this regard. In addition, the Court finds that plaintiffs have provided ample support for their contention. Accordingly, the Court determines that ACDs are properly considered prosthetic devices and should be covered under Georgia's plan for medical assistance.

### 3. Speech-language pathology equipment

■ Finally, plaintiffs contend that ACDs meet the criteria for coverage as

---

**22.** Defendants make the odd argument that ACDs do not fit into the definition of home health services because ACDs can also be used outside the home as well. (Defs.' Cross–Mot. for Summ. J. [59] at 30.) Defendants cannot point to any federal regulation or section in its policy manual that adds the requirement that medical equipment must only be utilized in the home to qualify for coverage, however. This is so because, as defen-

dants concede, other items, such as wheelchairs or artificial larynxes, are covered as durable medical equipment even though they can be utilized outside the home. (*Id.*)

**23.** Indeed, plaintiffs note that fifteen other states currently classify ACDs as prosthetic devices. (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 28 n. 79.)

speech-language pathology (hereinafter "SLP") equipment, a service which Georgia has opted to cover.[24] SLP services are included in the statutory "physical therapy and related services" benefits category. 42 U.S.C. § 1396d(a)(11). The federal regulations define services for individual with speech, hearing, and language disorders as "diagnostic, screening, preventative, or corrective services provided by or under the direction of a speech pathologist, for which a patient is referred by a physician or other licensed practitioner of the healing arts.... It includes any necessary supplies and equipment." 42 C.F.R. § 440.110(c) (1998). Plaintiffs assert that ACDs clearly match the criteria for SLP services, as these services have been recognized in the practice of SLP since 1981. (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 39.)

Moreover, plaintiffs cite to the Eighth Circuit's holding in *Meyers* that the state's plan for medical assistance was required to provide electronic speech devices under this category of services. *See Meyers*, 776 F.2d at 244. Finally, plaintiffs note that "HCFA has recognized that ACDs can be equipment within the scope of a therapy service." (Pls.' Br. in Supp. of Mot. for Summ. J. [56] at 39 & 22 n. 58.)

As defendants do not address plaintiffs' contention that ACDs meet the criteria for SLP equipment, it appears that they do not oppose plaintiffs' motion in this regard. In addition, the Court finds that plaintiffs have provided ample support for their contention. Accordingly, the Court determines that ACDs are properly considered SLP equipment and should be covered under Georgia's plan for medical assistance.

## V. *Remaining Issues*

Accordingly, the Court has determined that ACDs meet the criteria for at least one category of coverage and appear to meet three categories. This determination that ACDs meet the criteria for coverage does not end the Court's involvement with this case, however. As plaintiffs correctly explain:

> Coverage of ACDs is only one of the issues presented in this case. Equally important is that [GDMA] must have reasonable, substantive standards for determining ACD access, and a decision making process for these devices that is consistent with currently accepted standards of SLP and ACD practice. Plaintiffs have asserted that Medicaid must have ACD coverage criteria and a decision maker for ACD funding requests who can review ACD funding requests properly and consistently.

(Pls.' Reply Br. [65] at 36.) Plaintiffs contend that GDMA has not adopted reasonable standards for ACD coverage.

Defendants admit that they currently do not have standards for ACD coverage. Indeed, in their sur-reply brief, defendants assert that "[s]hould the Court rule in favor of Plaintiffs, the Department, contrary to Plaintiffs['] assumption, intends to formulate specific criteria for ACD claims." (Defs.' Sur–Reply Br. [74] at 3–4.) In a footnote, defendants note that GDMA has developed criteria for the potential handling of ACD claims which "with minor modifications, can be implemented should the Court rule in plaintiffs' favor." (*Id.* at 4 n. 1.) Defendants ask the Court to remand each plaintiff's individual case to the administrative review level such that the soon-to-be-developed criteria can be administered. (*Id.* at 4.)

Plaintiffs argue that the proposed criteria has at least two potential problems. (Pls.' Resp. to Defs.' Mot. to File a Reply

---

24. Plaintiffs note that three states, California, Oregon, and Minnesota all classify ACDs within this service classification. (Pls.' Br. in Sup. of Mot. for Summ. J. [56] at 38 n. 102.)

to Pls.' Reply Mem. in Supp. of Mot. for Summ. J. [77] at 7.) First, plaintiffs contend that the draft criteria limiting ACD coverage to those persons younger than age 21 violates the Medicaid Act's "reasonable standards provision" and the "amount, duration and scope" regulation. (*Id.* at 7–8.) To support this contention, plaintiffs cite the district court decisions in *Hunter* and *Fred C.*, which hold similar restrictions in violation of the Medicaid statutes, and the September 4, 1998 HCFA policy letter, which suggests that restricting ACD coverage to beneficiaries under the age of 21 violates the Medicaid statutes. (*Id.* at 8.) Second, plaintiffs contend that the draft criteria inappropriately limits ACD coverage to those beneficiaries who are "unable to communicate basic needs." (*Id.*) Accordingly, plaintiffs ask the Court to order defendants to adopt their proposed criteria.

Although defendants have not responded to the two specific objections that plaintiffs make to defendants draft proposal,[25] the Court notes that, as with all plaintiffs' arguments in this litigation, plaintiffs' objection appears sound. Moreover, although both parties agree that reasonable criteria for ACD coverage must be developed, the parties have not yet agreed as to the proper criteria that should be utilized. The Court is sympathetic to plaintiffs' concerns that an already lengthy period of litigation not be unduly stretched to allow defendants a leisurely drafting time period. Indeed, defendants have had a great deal of time already to arrive at an appro-

priate draft. The Court, however, also understands defendants' concern that, in addressing coverage for ACDs, it not create a model criterion that would prove too expansive in this or other contexts.[26]

The best procedure appears to be to require Dr. Taylor to use plaintiffs' draft proposal as a starting point for any specific modifications that he wishes to make. Defendant Dr. Taylor shall offer in writing to plaintiffs any specific objections, and the reasons therefore, as to the language in plaintiffs' draft proposal; Dr. Taylor must also offer alternative language as to any portions of plaintiffs' language with which he disagrees. Defendant Dr. Taylor shall accomplish this within thirty (30) days from the date of this Order.[27] If the parties cannot come to agreement within twenty (20) days from that date (fifty (50) days from the date of this Order), the Court will schedule a conference in an effort to resolve this matter as expeditiously as possible. The parties shall notify the Court by April 24, 2000 as to whether they have resolved their differences. If a conference is necessary with the Court, it will be scheduled for sometime during the week of May 8, 2000. Before the date of the conference, the Court will consult with counsel to determine what type of written submissions would best enable the Court to referee the disputes.

The Court further notes that by engaging in this cooperative venture, Dr. Taylor is not waiving any appellate rights he may have as to the correctness of the Court's

---

**25.** Defendants, in a brief submitted in response to plaintiffs' concerns regarding the newly drafted criteria, admit that they must make "minor modifications to the criteria" before putting them into effect. (Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for Auth. to File a Reply [85] at 2.)

**26.** Given the fact that defendants already cover artificial larynxes under Medicaid and that

47 states cover ACDs, however, the drafting process by defendants should not be that daunting.

**27.** By setting this deadline, the Court does not wish to discourage informal, oral colloquies between the parties before that deadline in an effort to get this matter resolved.

underlying order that ACDs cannot be categorically excluded from Medicaid coverage. Indeed, the Court hopes that defendant Dr. Taylor will not offer futile objections or insertions to plaintiffs' proposal that will only serve to extend this process and to try this Court's patience.[28]

Accordingly, the Court ORDERS Dr. Taylor, within the above deadlines, to develop a criteria for ACD coverage, whether that criteria be a modified version of the criteria attached to defendants' sur-reply, a modified version of the criteria submitted by plaintiffs, or a blend of the two. Once Dr. Taylor has a criteria in place, whether mandated by the Court or agreed to by defendants, the Court will remand plaintiffs' Medicaid applications for administrative review. At that time, GDMA will utilize the newly developed ACD standards to determine coverage. Thus, while the Court has granted plaintiffs' substantive motion for summary judgment and denied defendants' substantive motion, it reserves ruling on the scope of any injunctive relief to be granted in this case until after the completion of the parties' efforts to draft a reasonable ACD coverage criteria.

### CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Summary Judgment [56] should be **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**, plaintiffs' Motion to Exceed Page Limitation [58] should be **GRANTED**, defendants' Cross–Motion for Summary Judgment [59] should be **DENIED**, defendants' Motion to Exceed Page Limitation [61] should be **GRANTED**, plaintiffs' Motion to Enforce the February 5, 1998 Stipulation and Order [62] should be **DENIED**, Lawrence "Kirby" H.'s Motion for Summary Judgement [63] should be **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**, Lawrence "Kirby" H.'s Motion to Intervene [64] should be GRANTED, plaintiffs' Motion to Exceed Page Limitation [66] should be GRANTED, defendants' Motion for Authorization to File a Reply to Plaintiffs' Reply Memorandum in Support of Their Motion for Summary Judgment [73] should be **GRANTED**, and defendants' Motion for Authorization to File a Sur–Reply to Plaintiffs' Reply Memorandum in Support of Their Motion for Intervention [78] should be **GRANTED**.

Moreover, the Court ORDERS defendant Dr. Taylor to submit to plaintiffs in writing any specific objections that he has identified in the language of plaintiffs' draft proposal; Dr. Taylor must also offer alternative language as to any portions of plaintiffs' language with which he disagrees. Dr. Taylor shall accomplish this within thirty (30) days from the date of this Order. If the parties cannot come to agreement within twenty (20) days from that date (fifty (50) days from the date of this Order), the Court will schedule a conference in an effort to resolve this matter as expeditiously as possible. The parties

---

**28.** The Court notes that plaintiffs are concerned about having a qualified person act as a consultant for all ACD requests. Plaintiffs raise this concern because they allege that in making determinations regarding funding for ACDs, defendants have previously used an individual with no prior speech-language pathology training. Although the Court is uncertain whether it would ultimately order GDMA to utilize such an individual, it notes that the employment of a speech-language pathologists to consult with GDMA or to act as the final decisionmaker could well serve the interests of both parties. As plaintiffs explain, GDMA utilizes consultants on a regular basis to aid in funding determinations and other tasks. Further, plaintiffs assert that other states regularly employ consultants and speech-language pathologists to act as decisionmakers for ACD funding requests. While such issues as the use of a particular kind of consultant might not be embodied in a permanent written policy, these issues are appropriate for discussion between the parties.

shall notify the Court by April 24, 2000 as to whether they have resolved their differences. If a conference is necessary with the Court, it will be scheduled for the week of May 8, 2000. The Court will issue a final Order delineating the scope of any injunctive relief to be granted at a later date.

SO ORDERED.